The plaintiffs, Patricia Dixon and Louise Thompson, co-administratrixes of the estate of Anita Thompson, appeal from a judgment against them entered after a jury *Page 5 
returned a verdict for the defendant, Kim A. Hardey, M.D., in an action alleging medical malpractice. We reverse.
On July 6, 1987, Anita Thompson entered Southeast Alabama Medical Center ("Hospital") for the treatment of uterine fibroid tumors. The following day, Dr. Hardey, an obstetrician and gynecologist, successfully removed a benign tumor. Following surgery, Dr. Hardey administered an epidural injection of morphine sulfate ("Duramorph") for pain control. Ms. Thompson was removed from the recovery room at approximately 1:00 p.m. and was taken to a room on the post-surgical floor, where she was monitored by the nursing staff at 15- to 30-minute intervals. At 4:48 p.m., Ms. Thompson was found devoid of pulse or respiration. Efforts at resuscitation were unsuccessful.
On June 21, 1988, Ms. Dixon sued the Hospital for damages, alleging that it had been negligent and that its negligence had caused the death of Ms. Thompson. On August 2, 1988, she amended her complaint to add a claim against Dr. Hardey. The claim alleged negligence in the administration of the post-operative pain medication and in the instruction of hospital personnel regarding procedures for monitoring the patient during recovery. On July 26, 1989, the trial court dismissed the claims against the Hospital, after the Hospital had reached a pro tanto settlement with the plaintiff. Ms. Louise Thompson was added as a plaintiff on February 22, 1990. On March 7, 1990, the jury returned a verdict for Dr. Hardey.
At trial, the central issue was the standard of care for the postoperative monitoring of a patient treated with Duramorph. The plaintiffs contended that proper monitoring should have involved the use of an apnea monitor or other instrument to detect the onset of Duramorph-induced respiratory depression, the condition from which the plaintiffs say Ms. Thompson died.
To offer proof that Dr. Hardey had violated written standards of care applicable at the time of the alleged malpractice, the plaintiffs attempted, unsuccessfully, to introduce into evidence a number of documents, including one marked as plaintiffs' Exhibit 14, which was entitled "Nursing Service Department Labor Delivery Procedure." Exhibit 14 reflected policies and procedures adopted by the Hospital in February 1986. The plaintiffs contend that the trial court's exclusion of the exhibits was error. With regard to exhibit 14, we agree.
Exhibit 14 would be relevant, upon proper authentication, to the standard of care applicable in 1987. It provided guidelines for the use of an apnea monitor in the post-operative surveillance of a patient treated with an epidural injection of morphine. The fact that Exhibit 14 expressly refers to labor and delivery does not preclude testimony regarding the similarity, and, thus, the relevance of procedures for monitoring patients after injections of morphine for pain control are administered where such procedures would logically overlap or concur.
Although the exclusion of the exhibit was error, a videotape of a deposition of the plaintiffs' expert, Dr. Martin Wingate, was introduced at trial. That videotape reveals the following testimony:
 "[MR. KEENE]: [For the defendant] Have you reviewed any policies or procedures of the Southeast Alabama Medical Center?
"[DR. WINGATE]: Yes, I have.
"[MR. KEENE]: Which policies did you review?
 "[DR. WINGATE]: I was given these policies. One is 'Duramorph Administration in the Recovery Room.'
"[MR. KEENE]: Could we see that please?
 "[DR. WINGATE]: Yes. One is the 'Use of the Apnea Monitor for Duramorph Administration' and there is a second page on the use of the apnea monitor. And I have here another — 'Epidural Narcotic, Care of the Patient Receiving Epidural Injection.' And finally, the 'Nursing Service Department Labor Delivery Procedure.'
". . . .
 "[MR. KEENE]: Do you feel that the materials you have reviewed are adequate *Page 6 
to enable you to formulate an opinion about this case?
"[DR. WINGATE]: Yes, I do.
 "[MR. KEENE]: In other words, do you know of any other information you may need to formulate your opinions?
"[DR. WINGATE]: No, I do not."
(Emphasis added.) Dr. Wingate, who then testified regarding the need for an apnea monitor, thus acknowledged that his opinion was based in part upon evidence contained in Exhibit 14 regarding the use of such instruments. We will not ground a reversal solely on the erroneous exclusion of a document when the general contents of the document were subsequently introduced through oral testimony. See Drs. Lane, Bryant,Eubanks Dulaney v. Otts, 412 So.2d 254, 259 (Ala. 1982);McLemore v. Alabama Power Co., 289 Ala. 643, 648,270 So.2d 657, 661 (1972). We have carefully considered the plaintiffs' arguments regarding the other excluded exhibits and conclude that their contentions regarding those exhibits are without merit.
More troubling, however, is the plaintiffs' contention that the trial court erred to reversal when it refused to strike, for cause, juror Rhonda Hedrick, a regular patient of the defendant physician. The record reveals the following colloquy during voir dire:
 "MR. GIVENS: [For the plaintiffs] Because, it is real important. You are going to be the sole judges of the facts in this case and I am the first one to admit that I am very biased and prejudiced in favor of my client and, I think Mr. Keene would agree, likewise. But as the sole judges of the facts, would you give each side proper consideration?
"A LADY: Dr. Hardey is my doctor, personally.
"MR. GIVENS: What is your name, ma'am?
"A LADY: Rhonda Hedrick.
 "MR. GIVENS: Ma'am, do you feel that would make you uncomfortable and unable to sit in a case in which your physician had been named?
 "MS. HEDRICK: Well, I don't know. I really don't.
 "MR. GIVENS: Is your concern such that you feel like you might not be able to put it out of your mind, the fact that you see this physician on a regular basis and that might affect your ability to be fair and impartial?
 "MS. HEDRICK: I don't know. So — but, I think it should be known to him. That is all.
 "MR. GIVENS: Do you think — knowing that he is your physician and you have seen him, when you listen to the evidence, you will have the facts in your mind and in some way, that might affect your ability to listen to the evidence because you know him on a personal basis?
"MS. HEDRICK: No.
 "MR. GIVENS: Would it make it a little harder for you?
 "MS. HEDRICK: I would hope not. I have sworn to be honest.
 "MR. GIVENS: Okay. You understand that this case is not about his reputation. He may be a good doctor. But, this is about one occurrence, one case.
 "MS. HEDRICK: (Nods her head in the affirmative.)
 "MR. GIVENS: You still see him on a continuing basis?
"MS. HEDRICK: Every six months.
 "MR. GIVENS: Every six months? Would you be able to look him in the face in six months —
 "MR. KEENE: [Counsel for Dr. Hardey] Your Honor, I object. I think the witness has answered all the appropriate questions.
"THE COURT: I sustain.
". . . .
 "MR. GIVENS: Have any of you or any members of your family or close personal friends ever been employed in a hospital, nursing clinic or any type of medical clinic or in any capacity with a doctor or health related field?
". . . .
 "A LADY: Rhonda Hedrick. I work for Dr. John Flowers, a children's dentist and orthodontist
 "MR. GIVENS: You work for someone in the health care profession? *Page 7 
"MS. HEDRICK: Yes.
 "MR. GIVENS: Taking that fact into consideration in conjunction with the fact that this defendant is your gynecologist, would that put additional pressure on you in serving as a juror?
 "MS. HEDRICK: I don't know. That is the only way I know to answer you. I would hope not.
 "MR. GIVENS: But, there can be some doubt because of that relationship?
"MS. HEDRICK: Could be.
 "MR. GIVENS: There is nothing wrong if any of you feel like it would unduly burden you or place prejudice, [however] slight; but, you feel that in the best interest of justice you would rather not serve, would that be the case?
"MS. HEDRICK: Yes."
(Emphasis added.) The plaintiffs insist that they should not have been required to expend a peremptory challenge to eliminate a juror who (1) was Dr. Hardey's regular patient, (2) was employed by a dentist, and (3) consequently expressed reservations about her ability to serve the "best interest of justice." We agree.
The principle of impartiality requires that the prospective juror " 'be indifferent as he stands unsworn.' " Wilson v.State, 243 Ala. 1, 10, 8 So.2d 422, 430 (1942). A challenge for cause must be sustained upon a showing of "probable prejudice" on the part of a veniremember. See Knop v. McCain,561 So.2d 229, 234 (Ala. 1989); Alabama Power Co. v. Henderson,342 So.2d 323, 327 (Ala. 1977); Grandquest v. Williams, 273 Ala. 140,146, 135 So.2d 391, 395 (1961).
In applying this test, we are cognizant of the "time-honored sympathy between doctor and patient." Gray v. Sherwood,436 So.2d 836, 837 (Ala. 1983). In Gray, we reversed the judgment of the trial court on the ground that two prospective jurors who had requested exclusion from the case on grounds that they were patients of the defendant physician should have been excused for cause. In that case we explained:
 "There is often a close personal relationship between physician and patient, derived, perhaps in part, from the necessity for trust and confidence upon the part of the patient in his physician's judgment. 'The sick man loves the physician because he is sick,' says Plato in Lysis (217a). The Roman philosopher Lucius Annaeus Seneca (8 B.C.-A.D. 65) explored the bond between physician and patient. We find his observations timely: 'Why then, are we so much indebted to these men? Not because what they sold us is worth more than we paid for it, but because they have contributed something to us personally.' Seneca, de Beneficiis, VI, 16."
Id. at 837 (emphasis added) (footnotes omitted).
As the plaintiffs in this case point out, "[i]t is difficult to imagine a more intimate or trusted relationship than [that which exists] between a gynecologist and patient." The relationship of physician and patient constitutes prima facie
evidence of probable prejudice on the part of the veniremember. The inference of bias is strengthened where, as here, the prospective juror "volunteers her doubts." See Knop v. McCain,561 So.2d 229, 234 (Ala. 1989).
Once prima facie evidence of prejudice has been presented, "it is the trial judge's function to question the juror further, so as to ascertain whether the juror can be impartial." Knop, 561 So.2d at 234. However, even if a juror eventually states that she could obey the judge's instructions or render a verdict exclusively upon the evidence, "the simple extraction of an affirmative response . . . does not necessarily absolve that juror of probable prejudice." Wood v.Woodham, 561 So.2d 224, 228 (Ala. 1989).
Even if a prospective juror never unequivocally admits bias, to disregard her apprehensions would be to ignore the realities of human nature. Where a juror vacillates in her response tovoir dire, her answers must be "taken as a whole." Knop,561 So.2d at 233; Ex parte Beam, 512 So.2d 723, 724 (Ala. 1987). Thus, when the aggregate effect of her response tends to verify the existence of "deep-seated impressions," she must be excluded for cause. Knop, 561 So.2d at 233. *Page 8 
The plaintiffs urge this Court to hold that, as a matter of law, a patient may never serve as a juror in a case against his or her personal physician. We decline to adopt such an absolute rule of exclusion. We do hold, however, that under the facts of this case, the plaintiffs' challenge for cause should have been granted.
Ms. Hedrick's response to voir dire questioning by the plaintiffs' counsel did nothing to rebut the inference of probable prejudice arising out of the physician-patient relationship. On the contrary, her answers reflected considerable apprehension regarding her relationship with her physician and her ability to render an impartial verdict in the case against him. Not only was she unable to state with assurance that the relationship would not influence her deliberation, but her remark "I think it [i.e., the fact that I am being considered for jury service in this case] should be known to him" betrayed a personal concern for that relationship. Such a concern is inconsistent with "the complete freedom from bias which should be present in the minds of all jurors." Ballard v. State, 225 Ala. 202, 203, 142 So. 668, 668
(1932).
Ms. Hedrick's misgivings eventually culminated in her affirmative reply to the question whether justice would be better served by her discharge. In addition, the trial judge not only failed to engage in any voir dire of the juror, but prevented further inquiry into the subject by the plaintiffs' counsel. See Knop, 561 So.2d at 234.
Because we hold that the denial of the plaintiffs' challenge for cause necessitates reversal of the judgment of the trial court, we pretermit any discussion of issues urged as further reasons for reversal. For the foregoing reasons, the judgment is reversed and the case is remanded to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.