David Russell Smith, Sr., the appellant, was convicted of the murder of Milton T. Russell, and of attempting to murder Michael David Russell and Jimmy Waddell. He was sentenced to three concurrent terms of life imprisonment. He raises five issues on this direct appeal from those convictions.
 I.
The appellant contends that his motion for a change of venue should have been granted due to what he alleges was extensive pretrial publicity that saturated the county.
The crimes occurred at the Russell Sporting Center in Florence, Alabama, on November 7, 1992. The appellant was arrested on November 23, 1992. Trial was held in April 1993. The appellant filed a motion for change of venue on January 10, 1993, stating that "[t]he alleged [murder] victim, Milton R. Russell, was a well-known citizen and business owner in this county for many years. He had high public visibility and his alleged murder evokes great passion and prejudice in this community." C.R. 34. *Page 706 
A pretrial hearing was held on the appellant's motion for a change of venue on February 22, 1993. In support of his motion, the appellant introduced 18 newspaper articles and a videotape containing "several news broadcasts from television stations." R. 135. The trial judge denied the motion on February 25, 1993. C.R. 56. After the conclusion of the voir dire of the jury and the exercise of the challenges for cause, defense counsel renewed his motion for a change of venue. R. 1000. The appellant's motion for change of venue was properly denied.
The voir dire of the jury venire began on April 19, 1993. R. 218. The record shows that there were 52 members on the venire. When asked "How many of you have heard about this case from any source whatsoever?" every veniremember stood. R. 290. Thereafter, each veniremember was individually voir dired in chambers. That voir dire was extensive and thorough.
Our review shows that the appellant challenged for cause 25 of the 52 venirepersons[1]. Nineteen of those challenges were granted. R. 939-50. Each of the remaining venirepersons expressed a beliefs or opinion that he or she could be fair and impartial and render a verdict based upon the evidence.
Although the appellant established the existence of substantial pretrial publicity, there was no showing that the publicity prejudiced the venire against the appellant. "It is well established in Alabama . . . that the existence of pretrial publicity, even if extensive, does not in and of itself constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense."Ex parte Fowler, 574 So.2d 745, 747 (Ala. 1990).
 "The defendant has failed to satisfy the test set out in Ex parte Grayson, 479 So.2d 76, 80
(Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), because he has not proved that 'there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity.' 'Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue.' Id. 'The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved.' Id. 'The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.' Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).
 " 'To ensure that the defendant has a fair and impartial jury, it is not necessary that the veniremembers be totally ignorant of the facts surrounding the case. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589
(1975). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).'
 "Ex parte Whisenhant, 555 So.2d 235, 238
(Ala. 1989)."
Kuenzel v. State, 577 So.2d 474, 483-84 (Ala.Cr.App. 1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
 "It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the *Page 707 
presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."
Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43,6 L.Ed.2d 751 (1961).
 "A criminal defendant is not constitutionally entitled to trial by jurors ignorant about relevant issues and events. . . . 'The relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.' . . . In determining the existence of presumptive prejudice, a court must consider the totality of the circumstances, including the type of pretrial publicity, the time lapse between peak publicity and the trial, and the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case. . . . We note that 'the presumptive prejudice standard . . . is only "rarely" applicable . . . and is reserved for an "extreme situation." ' . . . 'In short, the burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.' "
United States v. Lehder-Rivas, 955 F.2d 1510, 1524 (11th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 347, 121 L.Ed.2d 262
(1992).
Our review convinces this Court that the trial judge did not abuse his discretion in denying the motion for a change of venue.
 " 'The trial court's findings of impartiality should be overturned only for "manifest error." Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).' Fortenberry v. State, [545 So.2d 129 (Ala.Cr.App. 1988), affirmed, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990)]. 'Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931
(Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983).' Ex parte Grayson, 479 So.2d [76, 80 (Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)]. We find no abuse of discretion by the trial court or manifest error in his finding of impartiality."
Oryang v. State, 642 So.2d 979 (Ala.Cr.App. 1993) (every member of venire indicated that they had been exposed to pretrial publicity). See also Thomas v. State, 539 So.2d 375, 394
(Ala.Cr.App.) ("[a]t the beginning of voir dire, every member of the venire stated he or she had read or heard about this case"), affirmed, 539 So.2d 399 (Ala. 1988), cert. denied,491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). Here, as inThomas, 539 So.2d at 395, the appellant has "failed to show a connection between the pre-trial publicity and the existence of actual jury prejudice."
 II
The appellant contends that his motion to suppress the statements he made to Florence Police Officer Keith Joiner should have been granted.
Officer Joiner was one of the first law enforcement officers to arrive at the scene of the homicide. The officers were responding to a report of a shooting. At that time no one knew what actually had occurred and everyone at the scene was a suspect. Officer Joiner testified that "I was really unclear at that time who was the shooter and who was the shootee and how many people had been shot." R. 150.
As officers with weapons drawn approached the Russell Sporting Center, the appellant walked toward them from the building. Florence Police Officer Kimberly Hastie ordered the appellant to stop and to lie down on the pavement. Hastie testified: "My main concern was to get him to stop and put him on the ground in case he was the suspect, or if he was harmed to get him out of the line of fire." R. 192. Officer Joiner, who was with Officer Hastie, testified at trial that the appellant "was covered in blood, and I asked him had he been shot." R. 147. Joiner stated that the appellant replied: "I shot and killed Milton. He's inside. You may want to check on him." R. 148-49. The trial judge ruled that this statement was *Page 708 
admissible in the State's case-in-chief. C.R. 87.
Officer Joiner testified further that shortly thereafter, Florence Police Chief Richard Thompson arrived and "as he was coming up he asked me, 'Who's the shooter?' And before I could respond the suspect said, 'I am —' something." R. 149. Thompson testified that he looked at Officer Joiner because he thought the appellant was a victim and asked Joiner, "Do we know where the shooter is?" R. 203. He stated that before Officer Joiner could answer, the appellant rolled over and stated: "I'm the shooter. I killed Milton Russell. That damn boy of his shot me with a deer rifle. Now, get me an ambulance." R. 203-04. Thompson then obtained a tape recorder and read the appellant his Miranda[2] rights, after which the appellant requested a lawyer.
The judge ruled that the appellant's statement made in response to Chief Thompson's question to Officer Joiner was not admissible in the State's case-in-chief but that it would be admissible "by the State in rebuttal of any evidence presented by the defendant tending to prove the defendant was suffering from a mental disease or defect at the time of the alleged commission of the offense." C.R. 87.
The trial judge properly denied the motion to suppress the appellant's initial statement to Officer Joiner for two reasons, neither of which depends upon whether the appellant was in custody when he made the statement.
First, this case falls within the narrow scope of the "public safety" exception and the related "emergency" or "rescue" exception. See 3 W. Ringel, Searches and Seizures, Arrests andConfessions § 26.5(d) at 26-30 through 26-32 (2d ed. 1993); 1 W. LaFave, Criminal Procedure § 6.7 at 506-09 (1984) and at 115-17 (Supp. 1991). See New York v. Quarles, 467 U.S. 649,104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (police may, in swiftly developing circumstances, ask questions reasonably prompted by considerations of public safety without violating Miranda). "[Q]uestions aimed at the safety or rescue of another person are not considered interrogation, although responses to the questioning might be highly incriminating." 3 Ringel § 27.4(b) at 27-31 — 27-32. See also State v. Vickers, 159 Ariz. 532,768 P.2d 1177 (1989), cert. denied, 497 U.S. 1033,110 S.Ct. 3298, 111 L.Ed.2d 806 (1990). Here, Officer Joiner's question to the appellant was not designed to elicit any incriminating response but was asked solely for the purpose of determining whether the appellant was injured.
Furthermore, we note that " '[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the factfinding process' " does not require compliance with Miranda. Lemley v. State, 599 So.2d 64
(Ala.Cr.App. 1992). "Miranda does not prevent traditional investigatory functions such as general on-the-scene questioning; general on-the-scene questioning of a suspect does not constitute interrogation for Fifth Amendment purposes."Hubbard v. State, 500 So.2d 1204, 1224 (Ala.Cr.App.), affirmed,500 So.2d 1231 (Ala. 1986), cert. denied, 480 U.S. 940,107 S.Ct. 1591, 94 L.Ed.2d 780 (1987). Accord Bui v. State,551 So.2d 1094, 1108 (Ala.Cr.App. 1988), affirmed, 551 So.2d 1125
(Ala. 1989), vacated on other grounds, 499 U.S. 971,111 S.Ct. 1613, 113 L.Ed.2d 712 (1991) (officer's asking appellant about his children, whose corpses, along with the murder weapon, were on the bed next to appellant, was in the nature of general on-the-scene investigation and, thus, statement was admissible even though the appellant had not been read his Miranda
rights); Jackson v. State, 412 So.2d 302, 306-07
(Ala.Cr.App. 1982) (Miranda warnings not required when officers who were conducting general on-the-scene investigation of recent homicide asked, "What happened?" and accused gave incriminating response). See also Lemley v. State,599 So.2d 64, 71 (Ala.Cr.App. 1992); Fisher v. State, 587 So.2d 1027, 1038
(Ala.Cr.App.), cert. denied, 587 So.2d 1039 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).
 III
The appellant argues that the State failed to establish a proper predicate for the admission *Page 709 
of State's Exhibits 5 (a .38 caliber revolver) and 7 (the ammunition from that revolver — three fired and three unfired rounds) because the State did not present reasonably satisfactory evidence that the items admitted into evidence were the items originally recovered.
Florence Police Sergeant Pete Williford testified that on November 7, 1992, he went to the scene of the crime and recovered the revolver from the front seat of the appellant's truck. R. 1323. The basis for the appellant's argument is Williford's testimony that when he recovered the revolver] he "thought it was unloaded, but we later discovered because of the shells that was in it that it was [loaded]; it had some live rounds in it." R. 1324. Williford stated that approximately two or three weeks before trial "[w]hen [he was] inventorying and discussing the evidence at the evidence vault [with] District Attorney Jones and George Grabryan," he learned that the revolver contained three live shells and three spent shells. R. 1330. He explained that, when he seized the revolver, "I didn't want to open up the barrel and change the positioning of the rounds, so I just looked at it at an angle. And because there was no light shining in the truck, with those short rounds halfway down in there I thought they all had been expended, but only three of them turned out to have been." R. 1324. "Had I suspected that at the time I took the weapon — I was so concerned with not opening the pistol because of the positioning of the cylinder and was also concerned [about] not knowing the status of the gun, I didn't want to turn it where I looked directly down the holes because I'd have been pointing the barrel right at my face. So I had it, like, at a side angle, which didn't allow me to see all the way down in there, just halfway, and [I] made an incorrect assumption." R. 1331-32. He did not remove any shells from the revolver or change or alter the weapon in any way. R. 1325. He "never handled the shells at all." R. 1327. He delivered the revolver to Investigator Grabryan. R. 1325.
Police Investigator George Grabryan testified that he was the evidence custodian for the Florence Police Department. R. 1441. He stated that he received the revolver containing the ammunition (State's Exhibits 5 and 7) from Officer Williford. Grabryan did not change or alter the revolver and did not unload the revolver. The revolver remained in its holster while it was in his possession. R. 1453. He personally delivered the revolver to the "lab in Huntsville" on April 5. R. 1452. The revolver was returned to him by Selwyn Jones at the local forensic lab in Florence on April 19. R. 1452-53. The revolver was returned to him in an unloaded condition. The ammunition was returned in a separate sealed bag. Grabryan testified that the "normal procedure" for the lab was to "unload the guns when they receive them." R. 1454.
Selwyn Jones testified that he was employed with the Alabama Department of Forensic Sciences, Florence Division. He stated that he received State's Exhibits 5 and 7 in a sealed condition from John Kilbourn at the Huntsville laboratory. R. 1476. He said he transported those exhibits to the Florence laboratory and that he "kept [them] in my evidence storage facility until which time I returned [them] to Officer Grabryan." R. 1477. He testified that the exhibits remained sealed and that they were still sealed when he turned them over to Investigator Grabryan. R. 1478.
Brent Wheeler testified that he was employed by the Alabama Department of Forensic Sciences in Huntsville and was the administrator in charge of the laboratory, which provides services to law enforcement officers in North Alabama, R. 1235, and that he was "the only firearms examiner in North Alabama [who] handles cases regarding shootings in the 13-county area." R. 1236. He testified that on April 6, 1993, he came into possession of State's Exhibit 5, the revolver when he removed it from "our evidence locker." He stated that "[i]t was identified by the paperwork as having been brought to the office . . . by Florence police investigator George Grabryan." R. 1246. He testified that after he examined of the revolver, it was given to Selwyn Jones of the Florence lab. R. 1249.
Wheeler identified State's Exhibit 7 as "an envelope that I generated in our laboratory *Page 710 
that has ammunition [that was] removed from the Smith revolver at the time that I received it." R. 1253. He testified that when he received State's Exhibit 5, "[i]t had three fired and three unfired rounds. It's a six-shot revolver. It had three unfired wadcutter type reloads and three fired cartridge cases, two showing Remington brand and one showing Winchester." R. 1253-54.
Defense counsel objected to the admission of State's Exhibits 5 and 7:
 "I believe that there's not been a showing that those items are in substantially the same condition as they were when they were originally retrieved from the automobile of Mr. Smith on November the 7th. The Florence police officer [who] received those items, Sergeant Pete Williford, testified that when he took the pistol into his possession that he looked at the pistol and it had six spent rounds in it. Yesterday in his testimony he changed his testimony and stated that through oversight or bad light or not looking directly down the cylinder of the gun or various other reasons that he just simply made a mistake and that there were three live and three spent rounds.
 "I feel that that is not an acceptable excuse or a mistake that will allow these items of evidence to be admitted into evidence at this time in that I think that there's been a substantial change in them, that there's been some tampering with them by whoever — we do not know — someone in the chain somewhere along the line has tampered with this evidence, and I feel like the chain of custody has been broken and they should not be allowed into evidence." R. 1480-81.
In response to the appellant's objection to the admission into evidence of State's exhibits 5 and 7, the trial judge stated: "I heard the testimony of Officer Pete Williford, and I was satisfied that he gave ample explanation as to the difference in his approach the first time or his observation the first time as compared to the next time that he looked at the weapon." R. 1483. The trial judge then stated that he would withhold ruling until he had reviewed a video recording made by the police at the time the revolver was initially seized from the appellant's truck by Officer Williford. Later, the appellant's objection to the admission of State's Exhibit 5 and 7 was overruled without comment by the trial judge. R. 1540-41.
In Ex parte Holton, 590 So.2d 918, 919 (Ala. 1991), the Alabama Supreme Court set "forth an analysis to be followed in deciding whether a proper chain of custody has been shown."
 "This opinion sets forth an analysis to be followed in deciding whether a proper chain of custody has been shown. We have held that the State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a 'reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' McCray v. State, 548 So.2d 573, 576
(Ala.Crim.App. 1988). Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
 "The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
 "If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one *Page 711 
of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility?"
Holton, 590 So.2d at 919-20.
Here, the evidence of the chain of custody was that Officer Williford seized the revolver and gave it to Investigator Grabryan who transported the weapon to the forensic laboratory in Huntsville. Brent Wheeler retrieved the revolver from the evidence locker in the lab, examined it, removed the ammunition from the revolver and packaged it separately. These items were later given to Selwyn Jones. Jones transported these items to the Florence lab, and later returned them to Officer Grabryan.
In this case, there appear to be two "breaks" in the chain of custody. First, the Huntsville laboratory personnel who accepted the revolver from Investigator Grabryan and deposited the weapon in the evidence locker did not testify and was not identified. Second, it is not clear what was done with the gun and ammunition immediately after Brent Wheeler examined them. Wheeler testified only that the items were later given to Selwyn Jones. Jones testified that he received the items from John Kilbourn. See Ex parte Works, 640 So.2d 1056 (Ala. 1994) (missing link in chain of custody of knife where State did not (1) identify the person in the Department of Forensic Sciences who received the knife, (2) identify the person in the department who ultimately disposed of the knife, or (3) show the safeguarding and handling of the knife while it was in the custody of the department; however, missing link held to be harmless error under circumstances of case); Ex parte Garrett,608 So.2d 337 (Ala. 1992) (missing link where officer delivered marijuana to state forensic lab without identifying any specific individual and forensic scientist testified that he received the marijuana from identified laboratory employee who did not testify). See also Russaw v. State, 624 So.2d 234
(Ala.Cr.App. 1993). Compare Ex parte Jones, 592 So.2d 210
(Ala. 1991) ("[a] gun is properly admitted into evidence [over a chain of custody objection] when it is identified at trial as being the weapon used in the commission of the offense");Moorman v. State, 574 So.2d 953, 956 (Ala.Cr.App. 1990) (totality of circumstances established reasonable probability of identity of blood sample and integrity of continuity of possession "[d]espite the facts that two 'links' in the chain of custody did not testify and were only generally identified as a unit secretary and a person from the laboratory").
However, neither of these "breaks" were made an issue by the appellant either at trial or on appeal. At both trial and on appeal, the appellant argues that the revolver introduced into evidence is not in the same condition as when it was seized because the testimony at trial was that three fired and three unfired rounds were removed from the revolver while there was testimony that Officer Williford "recovered State's Exhibit # 5 and opened the cylinder and noted that there were 'six spent shells.' (R. 1324-25, R. 1329-30)." Appellant's brief at 49. The record references cited by the appellant do not support his argument that Officer Williford "opened the cylinder." Williford did testify:
 "I cracked the cylinder open just slightly because I didn't want to look straight down the barrel to see if there was one behind the hammer of the gun. And so I just cracked it, and I was being cautions to make sure when I closed the gun it was back over the same chamber that I had opened it because in some cases the exact positioning of the chamber can be important. And I just closed it back up and turned it back over to [Grabryan] in the bag the way it was." R. 1326-27.
It appears that, under Ex parte Works, 640 So.2d 1056
(Ala. 1994), the appellant's objection was sufficient to preserve the issue of the missing link for review, even though it has not been called to our attention. *Page 712 
The appellant's assertion that "[t]he facts are that the evidence had been tampered with or altered between the day it was recovered (November 7, 1992) and the day it was offered into evidence at trial (April 23, 1993)" is simply not supported by the record. Appellant's brief at 51. " ' "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. . . . 'The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to areasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.' " ' " Green v. Alabama Power Co.,597 So.2d 1325, 1328 (Ala. 1992) (quoting Ex parte Williams,505 So.2d 1254, 1255 (Ala. 1987) as quoted in Ex parte Williams,548 So.2d 518, 520 (Ala. 1989). The evidence in this case satisfied that purpose.
Moreover, any error in the admission of the gun and ammunition was harmless. In Ex parte Works, supra, our Supreme Court held:
 " 'The admission of incompetent evidence is harmless error where the fact to which such evidence relates is otherwise established by competent evidence.' . . . Because pictures of the knife and testimony about the knife had been admitted without objection, because the knife had been identified as the one Works had had with him when Edwards was killed, and because it had been established that Edwards died of a stab wound, we hold that the error in admitting the knife was harmless."
Here, it was not disputed that the appellant shot the victim with the revolver. In opening argument, defense counsel stated: "Mr. Smith is not saying to anyone that he did not hold that gun, [or that] he did not pull that trigger. He's not saying that. What his defense is is that when he did that, it was not an intentional act; it was not something that he even recalls at this point." R. 1029. In closing argument, defense counsel stated that "it is true we do not deny that Mr. Smith walked in there and fired the shot that ended the life of Mr. Russell — we don't deny that — but why did it happen?" R. 2072.
For these reasons, we find no reversible error in the admission into evidence of State's Exhibits 5 and 7.
 IV
The appellant contends that the verdict of the jury was contrary to the weight and sufficiency of the evidence. Specifically, the appellant asserts that "the jury arbitrarily ignored the evidence of intoxication in this case and failed to apply the law on intoxication to the facts of this case," and that "the evidence regarding his mental state presented at trial was sufficient to meet the 'clear and convincing evidence' burden of proof required for a defendant to be found not guilty by reason of mental disease or defect." Appellant's brief at 53, 54. We disagree.
In this case, the evidence is simply not clear and convincing that the appellant was intoxicated to the point of insanity or that he was suffering from a mental disease or defect that rendered him incapable of appreciating the criminality of his conduct. There was undisputed evidence that the appellant was intoxicated at the time of the crime. A blood test made after his arrest showed that the appellant had a blood alcohol level of .162%. There was also evidence that the appellant was suffering from major depression, alcohol dependence, and temporary organic mental disorder (blackout during alcohol intoxication).
 "In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App. 1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675
(Ala.Cr.App. 1983). Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of *Page 713 
forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state."
Ex parte Bankhead, 585 So.2d 112, 121 (Ala. 1991).
Here, the appellant's "conduct and demeanor immediately after the crime provided a reasonable inference of sanity."Cunningham v. State, 426 So.2d 484, 491 (Ala.Cr.App. 1982). There was testimony that as the appellant pointed the revolver at Russell, he stated, "Milton, this is the end." R. 1059. Immediately after the shooting, the appellant obeyed the order of Officer Hastie to stop, "put his hands up, . . . to get down on the pavement facedown, . . . and to put his hands out." R. 1344. The appellant then stated, "I shot and killed Milton. He's inside. You may want to check on him." R. 1370. Paramedic Frankie Thaxton testified that he could not determine whether the appellant was drunk or sober but that the appellant responded to his questions and was alert. R. 1390. When asked what happened, the appellant told Thaxton that he had "killed the son of a bitch." R. 1392. Physician Allen Long stopped at the scene of the crime to render assistance. He testified that the appellant was able to give logical, rational answers to his questions and that he did not observe "anything to cause [him] to believe this person was delusional or hallucinatory or was suffering from any kind of major psychotic mental disease." R. 2004.
Psychiatrist W.H. Welcher, a witness for the defense, examined the appellant six weeks before trial and concluded that the appellant was suffering from a "major depression, severe depression, . . . from chronic alcoholism, and . . . from acute alcoholism." R. 1918. It was his opinion that "these medical problems would seriously impair his ability to form the requisite intent for first degree murder." However, he also testified that he did "not feel [the appellant] would meet the criteria for legal insanity at the time of the offense." R. 1930. Dr. Welcher stated, "I don't think there's any question that Mr. Smith understood the nature of the act. He made statements to that effect to people. Whether he understood the wrongfulness of it I'm not sure, some of the implied tone of his voice in some of these comments would suggest that he did." R. 1930.
Psychologist Lawrence Maier, a rebuttal witness called by the prosecution, examined the appellant in February 1993. He concluded that the appellant was not suffering from any major psychiatric illness at the time of the crime. "He was intoxicated, and there were events related to that, but he was not suffering from major mental illness [or from an psychotic disorder of either thinking or mood] at the time of the alleged crime." R. 2029.
Here, there was conflicting evidence on the issue of the appellant's sanity. Applying the principles we collected and set out in Ellis v. State, 570 So.2d 744, 749-57
(Ala.Cr.App. 1990), we conclude that the evidence of the appellant's insanity is not so clear and convincing that the verdict of the jury is contrary to the weight of the evidence and is wrong or unjust. "In order for this Court to reverse [a guilty verdict on the ground that it is contrary to the weight of the evidence of insanity, the] evidence of insanity must be 'overwhelming,' 'uncontradicted,' and 'clear,' . . . strong and undisputed." Sistrunk v. State, 455 So.2d 287, 289
(Ala.Cr.App. 1984) (citations omitted). "Here, the appellant's evidence of insanity was contradicted. It is a fundamental principle of appellate review that this Court cannot weigh the credibility of witnesses." Bullock v. State, 586 So.2d 284, 285
(Ala.Cr.App. 1991) ("[w]e do not view the evidence of insanity as clear and convincing, even though that evidence was substantial"); Cowan v. State, 579 So.2d 13 (Ala.Cr.App. 1990) ("Despite the fact that the appellant did present a strong insanity defense, the evidence was not so clear and convincing as to compel a verdict in his favor. We agree with Dr. Rivenbark's testimony that this was a 'close call.' "). "The evidence [in this case] was simply not sufficient as a matter of law to overcome the presumption of sanity and to justify reversing the jury's verdict." Graham v. State, 383 So.2d 892
(Ala.Cr.App.), cert. denied, 383 So.2d 895 *Page 714 
(Ala. 1980)." Magwood v. State, 426 So.2d 918, 923
(Ala.Cr.App. 1982), affirmed, 426 So.2d 929 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983).
 V
We reject the appellant's argument that the trial court committed reversible error in denying six of his challenges for cause. We have reviewed the individual voir dire of those six venirepersons: # 23 (R. 383-401), # 37 (R. 433-49), # 39 (R. 449-68), # 90 (R. 732-41), # 127 (R. 926-31), and # 128 (R. 931-38).
"Where a juror vacillates in her response to voir dire, her answers must be 'taken as a whole.' Knop [v. McCain,561 So.2d 229, 233 (Ala. 1989)]; Ex parte Beam, 512 So.2d 723, 724
(Ala. 1987). Thus, when the aggregate effect of her response tends to verify the existence of 'deep-seated impressions,' she must be excluded for cause. Knop, 561 So.2d at 233." Dixon v.Hardey, 591 So.2d 3, 7 (Ala. 1991).
 " ' "A trial judge's finding on whether or not a particular juror is biased 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' [Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985).]" ' Jones v. State, 572 So.2d 504, 506 (Ala.Cr.App. 1990), quoting Martin v. State, 548 So.2d 488, 490
(Ala.Cr.App. 1988), affirmed, 548 So.2d 496
(Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
 " ' "Our Supreme Court has held that '[n]o right of an accused felon is more basic than the right to "strike" a petit juror from a panel of fair-minded impartial prospective jurors.' Ex parte Beam, 512 So.2d 723, 724 (Ala. 1987). The propriety of a trial court's ruling in the challenge of a venireperson for cause based on bias must be measured against a defendant's constitutional right to a fair trial. Ex parte Beam, U.S. Const. Amends. VI, XIV. . . ." '
 "England v. State, 601 So.2d 1108, 1109
(Ala.Cr.App. 1992), quoting Hunter v. State, 585 So.2d 220, 221 (Ala.Cr.App. 1991).
 " ' "To disqualify a prospective juror, he must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. Such opinion must be so fixed as that it would bias the verdict a juror would be required to render. Hammil v. State, 90 Ala. 577, 8 So. 380." McCorvey v. State, 339 So.2d 1053, 1057
(Ala.Cr.App.), cert. denied, 339 So.2d 1058
(Ala. 1976). "A 'fixed opinion' which will bias a verdict is one that is a conviction or prejudgment, a strong or deep impression which closes the mind of a juror and combats the testimony and resists its force." Nobis v. State, 401 So.2d 191, 197 (Ala.Cr.App.), writ denied, 401 So.2d 204 (Ala. 1981).
 " ' "[A] proper challenge for cause exists only when a prospective juror's opinion or bias is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence. See Sparks v. State, 450 So.2d 188 (Ala.Cr.App. 1984); Clark v. State, 443 So.2d 1287 (Ala.Cr.App. 1983); Gwin v. State, 425 So.2d 500 (Ala.Cr.App. 1982), writ quashed, 425 So.2d 510 (Ala. 1983). Further, . . . a trial court's ruling on a challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless there is a clear showing of an abuse o[f] discretion by the trial court. See Price v. State, 383 So.2d 884 (Ala.Cr.App.), cert. denied, 383 So.2d 888
(Ala. 1980); Motes v. State, 356 So.2d 712
(Ala.Cr.App.), cert. denied, 356 So.2d 720
(Ala. 1978)."
 " 'Ex parte Rutledge, 523 So.2d 1118, 1120
(Ala. 1988).'
 "Siebert v. State, 562 So.2d 586, 595-96
(Ala.Cr.App. 1989), affirmed, 562 So.2d 600
(Ala. 1990), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990). Cf. Black v. State, 596 So.2d 40 (Ala.Cr.App. 1991) (wherein a potential juror clearly voiced bias and a 'fixed opinion,' and the cause was remanded to determine whether the juror could lay aside his 'fixed opinion').
 " ' "[A] proper challenge for cause exists only when a prospective juror's opinion or bias is so fixed that he or she *Page 715 
could not ignore it and try the case fairly and impartially according to the law and the evidence." Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala. 1988). "[A] trial court's ruling on a challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless there is a clear showing of abuse of discretion by the trial court." Rutledge, 523 So.2d at 1120. . . .
 " ' "In challenging a juror for cause, the test to be applied is that of probable prejudice. . . . While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court. . . . This Court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised. . . . A reversal is not appropriate absent abuse of this discretion. . ..
 " ' "Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. . . . This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence."
 " 'Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989). See also Wood v. Woodham, 561 So.2d 224, 227
(Ala. 1989). "Thus, even though a prospective juror admits to a potential bias, if a further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge's refusal to grant a motion to strike for cause is not error." Perryman v. State, 558 So.2d 972, 977
(Ala.Cr.App. 1989).'
 "Parker v. State, 587 So.2d 1072, 1082-83
(Ala.Cr.App. 1991).
 " 'Proof that the juror has a bias or fixed opinion is insufficient. There must be proof that the opinion was "so fixed that it would bias the verdict of the juror." ' Clark v. State, 443 So.2d 1287, 1288 (Ala.Cr.App. 1983)."
Forehand v. State, 624 So.2d 688, 693-94. (Ala.Cr.App. 1993).
Here, as in Roberts v. Hutchins, 613 So.2d 348, 350
(Ala. 1993):
 "We emphasize that a trial judge is given broad discretion in regard to sustaining or denying a challenge for cause, and his decision is therefore entitled to great weight and will not be interfered with unless it is clearly erroneous and equivalent to an abuse of discretion. Kumar v. Lewis, 561 So.2d 1082 (Ala. 1990). Here, it is clear that the trial court based its determination upon its own observations and impressions of the potential jurors, not upon an inaccurate application of our opinion in Dixon [v. Hardey, 591 So.2d 3 (Ala. 1991)]. The record indicates no abuse of the trial court's discretion; therefore, the judgment is affirmed."
"Trial judges are vested with broad discretion in determining whether to sustain challenges to jurors for cause. Ex parteNettles, 435 So.2d 151 (Ala. 1983)." Vaughn v. Griffith,565 So.2d 75, 77 (Ala. 1990), cert. denied, 498 U.S. 1097,111 S.Ct. 987, 112 L.Ed.2d 1072 (1991).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] The record may not reflect all the challenges for cause that were made or granted. In arguing his renewed motion for a change of venue, defense counsel stated: "It's my understanding at this time there have been 24 of those 53- or 52-24 challenges for cause at that time. I had several other challenges for cause on various jurors that the Court denied. I feel like those should have been granted, and in failing to do so the venire in my opinion at this time is not a fair and impartial venire." R. 1000-01. Although the appellant asserts in brief that 24 challenges for cause were granted, our review of the record reflects that 25 were granted.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966). *Page 716 
[EDITORS' NOTE: PAGE 716 CONTAINED DECISIONS WITHOUT PUBLISHED OPINIONS.] *Page 1327