Tuscaloosa County ("the County") and Jim Thomas Forestry Consultants, Inc. ("JTFC"), appeal and cross-appeal, respectively, from a judgment entered on a jury verdict in favor of Tuscaloosa County in its action against JTFC for damages to compensate for the destruction of a bridge. We affirm.
On May 12, 1989, the "Whittson bridge," a 100-year-old structure spanning the North River in northern Tuscaloosa County, collapsed when a truck owned by JTFC attempted to cross. The truck weighed approximately 40 tons — four times the bridge's posted carrying capacity.
On November 7, 1989, the County sued JTFC, alleging that JTFC had negligently or wantonly caused the destruction of its bridge. Following a jury's verdict awarding the County $100,000 in compensatory damages, both parties moved for a new trial on the grounds, inter alia, that the verdict was contrary to the law and the facts and was against the weight of the evidence. Both parties appealed the judgment entered following the denial of their post-trial motions.
Although the parties attack the judgment on various procedural grounds, the issue on which both the appeal and the cross-appeal turn is the proper method of calculating damages for the destruction of the bridge. Specifically, the County contends that the trial court erred in (1) instructing the jury that it was to calculate damages based on the "difference between the reasonable, market value[s] of the property" before and after the accident; (2) allowing JTFC to argue to the jury for a deduction from damages based on a "straight-line" depreciation formula; and (3) excluding evidence of a "cost-benefit" analysis, which purported to show the use and benefit of the bridge to the residents of the community it served. Similarly, JTFC contends in its cross-appeal that the trial court erred in (1) admitting evidence of the cost of replacing the bridge, particularly in allowing the jury to consider the cost of replacing it with one of larger dimensions; and (2) excluding a pre-accident "appraisal report," which purported to show the bridge's condition, projected expenditures for repair, and recommended schedules for the bridge's repair or rehabilitation. For procedural reasons, we deem it expedient to address first the issues raised in the cross-appeal.
 I. Issues Raised on Cross-Appeal
Damages for the destruction of a public bridge are expressly authorized by Ala. Code 1975, § 32-5-9, which provides in pertinent part:
 "(a) Any person driving any vehicle, object or contrivance upon any highway or highway structure shall be liable for all damage which said highway or structure may sustain as a result of any illegal or careless operation, driving or moving of such vehicle, object or contrivance, *Page 324 
or as a result of operating, driving or moving any vehicle, object or contrivance weighing in excess of the maximum weight prescribed by law. . . ."
This section was originally enacted as Act No. 516, § 41, 1949 Ala. Acts 740, and, as far as we have been able to determine, has never been interpreted by an appellate court. Thus, the measure of damages recoverable under this section appears to be a question of first impression.
A. Damages Calculation
As authority for its theory of damages calculation, JTFC cites Chambers County Commissioners v. Walker, 459 So.2d 861
(Ala. 1984), and Smith v. Springsteen, 385 So.2d 56
(Ala.Civ.App. 1980), thus contending, as we understand it, that the proper measure of damages is the value of the bridge before it collapsed, minus its value after the accident. The "value" measure, that is, "the difference in the value of [the] property immediately before and immediately after the injury to it," is one method used to calculate the damages recoverable for damage to structures attached to the land. Dan Dobbs,Handbook of the Law of Remedies § 5.1 (1975). Characteristically, however, it is linked to the concept ofmarketvalue,Dobbs supra, at 315-18, which is the amount that "a willing buyer . . . would pay to a willing seller." UnitedStates v. Certain Property in the Borough of Manhattan,403 F.2d 800, 802 (2d Cir. 1968). At least two courts considering a similar issue have concluded that damages for the destruction of a public structure such as a bridge cannot be determined by a reference to market value. See Commonwealth of PennsylvaniaDep't of Transp. v. Estate of Crea, 92 Pa. Commw. 242, 250,483 A.2d 996, 1001 (1977); Town of Fifield v. State Farm MutualAuto. Ins. Co., 119 Wis.2d 220, 226-227, 349 N.W.2d 684, 687
(1984) (destroyed bridge "had no market value, in the sense that no willing buyer or willing seller, even hypothetically, could be imagined").
We agree with these characterizations of bridges and similar structures. In our view, a consideration of damages for the destruction of an inherently unmarketable structure in the context of market value represents a contradiction in terms. Damages for the destruction of the Whittson bridge cannot, therefore, be computed on the basis of market value.
In the absence of a market on which to value a bridge,Town of Fifield adopted a damages formula based on theintrinsic value of the destroyed bridge to its owner — a formula requiring a consideration of an expanded roster of factors, including "opinion evidence, cost, use, cost of restoration, ease or likelihood of repair, continued usefulness, age of the property, and its condition."119 Wis.2d at 227, 349 N.W.2d at 687.[1] The court quoted with approval the following remarks:
 "In 25 C.J.S. Damages § 157a(2), p. 807, . . . we find the following:
 " 'In establishing the actual or intrinsic value of property having no market value, wide latitude in the evidence is permissible, and resort may be had to any facts which fairly tend to show such actual value. Thus, in determining the actual or intrinsic value of such property, or its value to the owner, it has been held proper to admit evidence showing the original cost, the replacement cost, the age of the property, its use and utility, and its condition.' "
Town of Fifield, 119 Wis.2d at 228, 349 N.W.2d at 688, quotingJohnson v. Board of County Commissioners, 138 Colo. 392, 395,336 P.2d 300 (1959) (disapproving the use of replacement cost as the measure of damages for a destroyed bridge) (emphasis inTown of Fifield). Interestingly, this rule as currently expressed in 25A C.J.S. Damages, § 157, at 57-58 (1966), specifically prohibits the admission of "evidence purporting to show the market value of such property."
The applicability of Town of Fifield's multi-factor valuation formula to structures *Page 325 
within the scope of § 32-5-9, however, appears tenuous at best. Just how such structures can be said to have a realistically calculable value to their owners, which are generally government entities, is not readily apparent. Instructive in this connection is the following colloquy that transpired during the County's attempt to introduce evidence of its cost-benefit analysis:
 "Q. [By counsel for the County]. Have you [used] any other method to determine the value of that bridge?
 "A. [By a County engineer]. I did a cost-benefit analysis.
 "Q. All right. If you would, describe for us what a cost benefit analysis is.
 "[By counsel for JTFC]. I'm going to object to the cost-benefit analysis. That goes into a determination of what is feasible for the county to build back on a one-to-one basis. It has nothing to do with the replacement cost. It has nothing to do with any cost whatever involved in the case, and no issues have been brought forth for it to be introduced.
 "[By counsel for the County]. Judge, it is a basis for valuation.
 "[By counsel for JTFC]. No, sir, Judge. It's not a basis of valuation. It's a basis to determine how much money it is feasible for the county to spend in order to justify building a new bridge. It has nothing to do with the value of the bridge.
 "[By the court]. Subject to it being tied up [to the issue of market value], I'm going to let it in.
". . . .
 "Q. [By counsel for the County]. Tell us what process you go through to do a cost-benefit analysis.
"A. Determine the [average daily traffic]. . . .
"Q. What is the [average daily traffic]?
"A. [Average daily traffic] listed a fifty.
". . . .
"Q. All right. And what do you do then?
 "A. You would determine the detour that the people that use the bridge would have to go out of their way to get around.
 "Q. All right. And . . . does that information tell you anything related to value?
 "A. It tells you what the cost has been for those citizens excluding their time, what cost they have incurred for detouring around.
 "[By counsel for JTFC]. Your Honor, now we object and move that it be excluded. It has no bearing whatsoever on the market value of the bridge at the time of the loss.
 "[By counsel for the County]. Judge, it bears on the issue of what the value of that bridge was to Tuscaloosa County and the public. And we think —
 "[By the court]. Subject to it being tied up, I'm going to let it in. I'll grant you an exception.
 "Q. [By counsel for the County]. Mr. Hagler, if you will, take me through the process of how you did your cost benefit analysis and what you came up with.
 "A. The [average daily traffic] was fifty vehicles per day.
". . . .
"A. The detour was 13.7 miles.
". . . .
 "A. [With] 365 days in a year — the current level by [the Internal Revenue Service], I believe is 27¢ per mile.
 "Q. [At 27¢ per mile], . . . what did you come up with for a cost-benefit analysis of one, annual period?
". . . .
 "A. Sixty-seven thousand, five hundred six dollars and seventy-five cents.
". . . .
 "Q. Mr. Hagler, with that information, how is the cost-benefit [analysis] . . . utilized in determining the value or decision to rebuild a bridge?
 "A. If the benefit . . . would exceed the cost of the bridge, we should replace it, and, as you can see, it wouldn't take very many years to replace it.
 "Q. All right. So, if the cost of that bridge to replace it exceeded what that *Page 326 
money would finance or would pay for, then that would bear on a decision to rebuild the bridge?
"A. Yes, sir.
 "Q. In your opinion, based on the analysis and based on these figures for replacement, was [replacement] justified . . . ?
 "A. To replace the bridge, yes, sir — the estimate being [this amount] and the cost-benefit that amount — it wouldn't be but about a five-year payback.
". . . .
 "[By counsel for JTFC]. Your Honor, again, we move to exclude all the testimony concerning the cost-benefit analysis. There is no connection [to] the fair market value of the Whittson bridge at the time it collapsed.
"[By the court]. Motion granted."
(Emphasis added.)
From the preceding remarks, it is clear that theCounty in its corporate capacity anticipated no tangiblebenefit from a bridge at this location. On the contrary, any benefit to be derived from such a structure inured to the area's residents, while the responsibility for the cost
devolved upon the County. Because the County's only interest in the Whittson bridge was a vicarious interest, attempts to ascertain its value to the County could rest only upon speculation and conjecture. See Crea, supra,92 Pa. Commw. at 250, 483 A.2d 996 at 1001 (purported valuation of an unmarketable structure such as a bridge "would be wholly speculative, the very pitfall to be avoided in proof of damages"). We disapprove, therefore, of the damages theories adopted by Town of Fifield and Johnson, and conclude that the multi-factor valuation formula as a method of determining damages is — like the market-value formula — here inapplicable.
Where damages calculations under such formulas are inapplicable or otherwise fail to compensate the owner of a destroyed structure adequately for his injury, the owner may recover the cost of its replacement. D. Dobbs, Handbook on theLaw of Remedies § 5.1 (1973). Thus, Crea held that the proper measure of damages for the destruction of a bridge "must be the reasonable cost of replacement by a similar structure consistent with current standards of design." The court reasoned that "[a]nything less would not compensate the owner for the actual loss." 92 Pa. Commw. at 253, 483 A.2d at 1002.
Of particular relevance to this case is State Highway Comm'nv. Stadler, 158 Kan. 289, 297, 148 P.2d 296, 300 (1944), in which the Kansas Supreme Court construed a statute similar to §32-5-9. That statute provided in pertinent part:
 "Any person driving any vehicle, object, or contrivance upon any highway or highway structure shall be liable for all damage which said highway or structure may sustain as a result of any illegal operation, driving, or moving of such vehicle, object, or contrivance, or as a result of operation, driving, or moving any vehicle, object, or contrivance weighing in excess of the maximum weight in this act. . . ."
As quoted in Stadler, 158 Kan. at 292-293, 148 P.2d at 298
(emphasis in Stadler). The Kansas Supreme Court held that the amount recoverable under the statute was the amount of the "actual replacement cost of the illegally destroyed structure."158 Kan. at 297, 148 P.2d at 300. The court reasoned that the intention of its legislature was, because of the inherent difficulties involved in assigning a value to highway structures, "to specifically designate the liability therefore [sic] was all damages sustained." Id.
We find this construction persuasive. Structures within the scope of statutes such as § 32-5-9 and the one involved inStadler are commonly provided by governmental entities that, in acting within statutorily prescribed powers and duties, deem them necessary to the public good. See James v. Conecuh County,79 Ala. 304, 307 (1885) (county commissioners are charged with "the duty to provide for keeping the necessary bridges in repair"); see also Ala. Code 1975, §§ 23-1-80 and -93. Such entities may, in fact, have little practical alternative but to replace destroyed bridges and similar highway structures at *Page 327 
the taxpayers' expense regardless of the cost. Replacement costs will include material and labor that must be purchased at contemporary prices, which, in many cases, will greatly exceed those involved in the original construction. We conclude that the measure of damages comporting most closely to the language of § 32-5-9(a), which expressly imposes liability "for all
damage which said highway or structure may sustain," is the cost of repair or replacement. Therefore, we reject JTFC's contention that the measure of damages is the value of the bridge before it collapsed minus its value after the accident.
These conclusions also dispose of JTFC's argument that the trial court erred in admitting evidence of the cost of replacing the 19th century Whittson bridge with atwo-lane structure that exceeded the length of the Whittson bridge by 108 feet. The County contended that the Whittson bridge did not satisfy current state highway specifications, because, as originally constructed, it was situated below the floodplain. Therefore, it contended, the extra length was needed in order to provide the requisite height. At trial, a construction expert estimated the cost of replacing the Whittson bridge with another one-lane bridge of similar length at between $200,000 and $300,000.[2]
Based on this evidence properly calculated, the jury could have returned a verdict considerably larger than the amount it awarded. Assuming, without deciding, that the trial court erred in admitting evidence of the costs of structures exceeding the dimensions of the Whittson bridge, JTFC suffered no prejudice as a result of the $100,000 verdict, which fell far below the minimum estimate of a bridge of the same dimensions as the original bridge. This Court will reverse a judgment only where it "appear[s] that the error complained of has probablyinjuriously affected substantial rights of the parties." Ala.R.App.P. 45 (emphasis added); see also Snow v. Boykin,432 So.2d 1210, 1214 (Ala. 1983).
B. Appraisal Report
JTFC attempted to introduce an "appraisal report" prepared by the State Highway Department as evidence of the pre-accident structural integrity and the projected financial liabilities of the bridge. The appraisal report was produced from raw data collected from on-site inspections by County bridge inspectors and entered on "structure inventory sheets." These sheets contained detailed observations as to deterioration of the component parts of the Whittson bridge and estimates of its remaining useful life. They were sent to the State Highway Department, which, based on an analysis of the raw data, made determinations regarding the need for repair or replacement, estimated the costs of such operations, and recommended a time schedule for effecting the operations recommended. The Department sent the appraisal reports to the County, which retained them in its files.
JTFC sought to introduce the appraisal reports through the testimony of Bobby Hagler, a Tuscaloosa County engineer, who stated that the reports were kept by the County in the ordinary course of business. The County objected on the ground that Mr. Hagler, a County official, was not competent to testify about the preparation or custody of the appraisal reports by the State Highway Department. The trial court sustained the objection, and JTFC contends that it erred to reversal in doing so. We disagree.
"The opinion evidence rule is equally applicable to the business record as it is to any other form of testimony." C. Gamble, McElroy's Alabama Evidence § 254.01(5) (4th ed. 1991). "A statement about a matter in a business record or entry, which constitutes an opinion that a witness having knowledge of the matters could not testify in the words of such statement because such testimony would be violative of *Page 328 
the opinion rule, is inadmissible." Id. at 680. The statement is inadmissible notwithstanding the fact that it "was made in the regular course of business and that it was the regular course of the business to make such a statement." Id. SeePierce v. State, 52 Ala. App. 422, 425, 293 So.2d 483, 485
(1973), cert. quashed, 292 Ala. 745, 293 So.2d 489 (1974) (psychologist's correspondence with the appellant's expert witness was, notwithstanding the business records exception to the hearsay rule, inadmissible "inasmuch as it was replete with opinions and conclusions of a putative psychologist whose qualifications appear[ed] nowhere in the record").
The only apparent relevance of the appraisal report, in addition to its references to the raw data from which it was prepared,[3] consisted of projected financial expenditures and timetables recommended for the repair or rehabilitation of the bridge. These estimates and recommendations rested entirely on the opinions of certain undisclosed individuals — presumably, Highway Department officials — whose qualifications JTFC made no effort to demonstrate. Because no attempt was made to identify or qualify such individuals as having the expertise to estimate the bridge's repair costs or to recommend replacement schedules, the appraisal report was inadmissible as violating the opinion evidence rule. The trial court did not err, therefore, in sustaining the County's objection to this evidence.
 II. Issues Raised on Appeal
The County contends that the trial court erred in instructing the jury in the following manner:
 "As I mentioned, the plaintiff has claimed compensatory or actual damages, and the measure of the damages for damaged personal property — there is a difference between the reasonable, market value of the property immediately before it is damaged and the reasonable, market value immediately after it is damaged. In other words, if you find for the plaintiff, you would determine from the evidence a reasonable, market value of the [bridge] immediately before it was damaged and then determine from the evidence the reasonable, market value of the [bridge] immediately after it was damaged — in its damaged condition. The difference found by you is the market value — in the market value — would be the measure of damages."
These instructions were erroneous, the County insists. It says, "[T]he 'fair market value' test had no application to this type of bridge, if, indeed, it could be applied to any bridge at all. The only rational measure of damages, therefore, would have to be the cost of replacing the bridge." Brief ofAppellant, at 7. Paradoxically, these instructions virtually parroted the County's "requested jury charge number 13," which stated:
 "The measure of damages for the damaged personal property is the difference between the reasonable market value of the property immediately before it is damaged and the reasonable market value immediately after it is damaged. In other words, if you find for the plaintiff you should determine from the evidence the reasonable market value of the Whittson bridge immediately before it was damaged and then determine from the evidence the reasonable market value of the Whittson bridge immediately after it was damaged in its damaged condition. The difference as found by you in the market value would be the measure of damage."
(Emphasis added.) Moreover, before the jury retired, both parties indicated "satisfaction" with the jury instructions. Thus, not only did the County fail to oppose instructions based on the concept of market value, but it affirmativelyrequested a charge containing the very element that it now assails. We can only conclude that the County's course of action in the proceeding *Page 329 
below constituted "invited error," for which this Court will not reverse. State Farm Mutual Automobile Ins. Co. v. Humphres,293 Ala. 413, 418, 304 So.2d 573, 577 (1974); Dixie HighwayExpress, Inc. v. Southern Ry., 286 Ala. 646, 651,244 So.2d 591, 595 (1971).
A. Depreciation
Similarly, the County did not preserve for review the question of depreciation. It contends that JTFC argued to the jury for a deduction from damages based on a "straight-line" depreciation method. JTFC denies that it made such an argument, and, apparently in the alternative, that the County failed to object. In either case, we cannot address the issue, because the arguments of counsel were not recorded. "It is well established that this court, absent an accurate and complete record, will not question the propriety of a trial court's ruling based on matter before that court." City of Scottsborov. Johnson, 436 So.2d 859, 860 (Ala. 1983); see also Valley Min.Corp. v. Metro Bank, 383 So.2d 158 (Ala. 1980). Consequently, we express no opinion on the propriety of deductions for depreciation in regard to an award of damages to compensate for destruction of a bridge.
B. Cost-Benefit Analysis
We also find no reason for reversal in the trial court's exclusion of the County's cost-benefit analysis, to which we have already spoken in section I.A. Evidence demonstrating the use of the bridge by the area's residents and its utility to them is relevant under Town of Fifield's expanded roster of valuation factors. We have concluded, however, that such a method of valuation is inappropriate for bridges and similar structures within the scope of § 32-5-9. Because the cost-benefit analysis had no bearing on the cost of replacement, the evidence was properly excluded.
For the reasons expressed above, the arguments advanced by the County and by JTFC for reversing the trial court's judgment must be rejected. Consequently, that judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] See generally Columbia Gas of Kentucky, Inc. v. Maynard,532 S.W.2d 3, 5 (Ky. 1975) (market value represents "sale value as distinct from intrinsic value or value to some particular person").
[2] Subsequently, estimates of the costs of constructing bridges that exceeded the width and length of the Whittson bridge were introduced. Those estimates ranged from $250,000-$350,000 for a two-lane bridge comparable to the original bridge in length, to $550,000 for a two-lane bridge that complied with state highway elevation standards.
[3] The raw data to which the appraisal reports referred were also contained in the structure inventory sheets. These sheets were introduced into evidence, and, through the examination and cross-examination of at least two witnesses, the included data were made the subject of detailed testimony. Thus, any error resulting from the rejection of the appraisal reports was, as to the factual evidence of the bridge's physical condition, harmless. See Dixon v. Hardey, 591 So.2d 3 (Ala. 1991); Pattonv. Palmer, 555 So.2d 127 (Ala. 1989).