[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 916 
RLI Insurance Company appeals from a judgment in favor of MLK Avenue Redevelopment Corporation ("MLK"). We affirm.
MLK purchased a tract of land in the City of Mobile to develop into a residential subdivision to be called F.D. Richardson Heights. MLK hired Polysurveying of Mobile, Inc., a professional engineering firm, to prepare plans and specifications for the development, to handle bids and to award the contract for construction of the water, sewer, and street improvements, and to provide instructions and directions relative to the execution of the work. R.P. Colquett, Inc. ("Colquett"), was awarded the construction contract, which required Colquett to complete the project in 60 days. RLI issued a performance bond on the contract naming Colquett as principal and MLK as owner or obligee of the bond.
After Colquett began construction, MLK's soils engineer, Geotechnical Engineering-Testing, Inc. ("GET"), discovered unsuitable soils on the site that needed to be excavated, removed, and replaced. The project engineer, Craig Bryant of Polysurveying, recommended that the additional work be performed. MLK approved a written change order, which the contract required, for payment of an additional $18,768 to remedy the unsuitable soil condition. The additional work apparently was performed, and MLK paid Colquett for this work. GET later recommended excavation and backfilling in other areas on the site. The project engineer testified that he orally advised MLK of the need for this extra work and that MLK orally approved it. Based on MLK's alleged oral approval, the project engineer instructed Colquett to perform the work, and Colquett performed it without insisting on a written change order. However, MLK has *Page 917 
refused to pay for the work; MLK denies that it orally approved the second change order for excavation and backfilling, and it contends that Colquett did not perform a significant amount of this extra work.
The contract provides that the project was to be completed in November 1999. Around that time, GET tested the concrete used in the improvements at the project, the subsoils or base used under the roads, and the asphalt road. GET found that Colquett's work was in compliance with the project requirements. In January 2000, the project engineer wrote to the City of Mobile Engineering Department and requested a final inspection of the project, which was necessary for the plat of the streets and improvements to be accepted by the City and recorded. After inspecting the project, the city engineer requested that additional work be performed. On February 23, 2000, the project engineer wrote to the City of Mobile Engineering Department once again, stating, "It is my opinion that this job was constructed in accordance with the approved drawings and the City of Mobile Standards." In response, the city engineer wrote to the project engineer: "I respectfully disagree with your assessment that the F.D. Richardson subdivision was constructed in accordance with the approved drawings and to City of Mobile standards." The city engineer listed a number of corrective measures that "must be taken prior to the City of Mobile accepting the subdivision for maintenance." Colquett protested the list of items but apparently performed some further work. On April 6, 2000, the work apparently having been found acceptable to the city engineer, the subdivision plat was recorded.[1] RLI contends that this recording constituted acceptance of the subdivision by the City of Mobile for purposes of maintaining the subdivision.
Some time after the subdivision plat was recorded, problems developed with the improvements Colquett had constructed. The record is unclear as to when the problems began to appear, but on February 14, 2002, the city engineer sent MLK a letter stating that the City of Mobile "requires that [certain] reconstruction work be performed in order to bring the subdivision up to standards," and listing specific items that needed to be corrected to bring the subdivision up to standards. Colquett refused to perform any further work. MLK turned to RLI under the performance bond, but RLI refused to have the work completed or to pay MLK the cost of having the work completed.
MLK sued RLI, seeking specific performance under the performance bond. MLK alleged that "the city of Mobile refused to take over maintenance of the subject streets, gutters and drains because of numerous deficiencies they discovered upon inspection . . . [which] were caused by Colquett's failure to follow the plans and specifications and were due to poor workmanship." MLK alleged that it had informed Colquett of the "deficiencies discovered by the city" but that Colquett had refused to make the "improvements necessary to insure compliance" with the contract requirements. MLK alleged that RLI was required under the performance bond to hire a new contractor to complete the work and that it had demanded performance *Page 918 
but that RLI had refused to perform under the bond. MLK alleged that it had suffered lost revenues and sales as a result of RLI's failure to perform, that the City has refused to accept maintenance of the streets, drains, and gutters in the subdivision, and that RLI has a duty to complete the necessary changes to the streets, drains, and gutters. MLK asked the trial court to order RLI to hire a new contractor to complete the work, and it also sought incidental damages, attorney fees, and costs.
After a trial at which evidence was presented ore tenus, the trial court found that, under the contract between Colquett and MLK, Colquett was to "construct the subdivision in a good and workmanlike manner, in accordance with the plans and specifications, and in compliance with the State Highway Department of Alabama Standard Specifications for Highway Construction, 1992 edition and the Mobile City Area Water Sewer Service System/Standard Specifications." The trial court concluded that there are several defects in the project and that "these defects are the result of R.P. Colquett's failure to construct the project in a workmanlike manner, and in accordance with the contract." The trial court described the scope of the work to be performed in a list of 18 items that is essentially the same list as the February 14, 2002, list prepared by the City of Mobile. RLI appeals.
 I.
RLI argues that MLK has suffered no damage because, it argues, the streets and improvements became the property of the City after the subdivision plat was recorded, and neither the City nor the residents of the subdivision have sued MLK. Therefore, RLI argues, MLK is not the real party in interest and has no standing to sue. MLK argues that RLI waived those arguments because RLI did not present them to the trial court. Neither MLK nor RLI distinguishes in its brief the argument that MLK lacked standing to sue from the argument that MLK is not the real party in interest. However, there are "fundamental differences between the principles of `real party in interest' and `standing.'" State v.Property at 2018 Rainbow Drive, 740 So.2d 1025, 1027 (Ala. 1999). "`[O]bjections to standing, unlike Rule 17(a) objections [that a plaintiff is not the real party in interest], cannot be waived.'" 740 So.2d at 1028 n. 1. We will not consider RLI's argument that MLK is not the real party in interest, because that argument is asserted for the first time on appeal and has thus been waived; however, we will consider RLI's argument that MLK lacks standing to sue.
RLI argues that MLK lacks standing to sue because, according to RLI, MLK has suffered no damage as a result of Colquett's alleged breach of the contract. However, it is well settled that an action based on a breach of contract will lie even where the plaintiff has suffered no actual damage. Avis Rent A Car Sys.,Inc. v. Heilman, 876 So.2d 1111, 1120 (Ala. 2003) (citing KnoxKershaw, Inc. v. Kershaw, 552 So.2d 126, 128 (Ala. 1989), andJames S. Kemper Co. v. Cox Assocs., Inc., 434 So.2d 1380,1385 (Ala. 1983)). "This is so, because `"[a]n unexcused failure to perform a contract is a legal wrong. Action will lie for the breach although it causes no injury. . . . The party whose legalright has been invaded by such breach is entitled to at least nominal damages, for the law recognizes that every injury imports damages."'" Avis Rent A Car, 876 So.2d at 1120, quoting Cooleyv. Gulf Bank, Inc., 773 So.2d 1039, 1048 (Ala.Civ.App. 1999) (Crawley, J., concurring in part and dissenting in part) (quoting in turn 11 Williston on Contracts § 1339A, at 206, *Page 919 
208 (3d ed. 1968)) (emphasis added in Avis).
In Avis, the plaintiff, Heilman, rented a car from Avis and was reimbursed by her employer for the rental fee she had paid Avis. Avis argued that because Heilman had been reimbursed by her employer for the rental fee, and because that was the measure of her damages, she lacked standing to sue Avis. This Court held that Heilman had standing to sue; the fact that she had been reimbursed for the cost of the rental — her actual damage — did not deprive her of standing to assert a breach-of-contract claim against Avis.
MLK is the promisee of Colquett's performance under the contract. Thus, Colquett's alleged breach of the contract constitutes an invasion of a legally protected interest of MLK. Therefore, even assuming that MLK has suffered no actual damage as a result of Colquett's alleged breach, Colquett's alleged unexcused failure to perform the contract is a legal wrong. SeeAvis, 876 So.2d at 1120. RLI's argument that MLK lacks standing because it has suffered no damage is, therefore, without merit.
 II.
RLI argues that the trial court erred in interpreting the contract to require reconstruction in accordance with the opinions of the city engineer for the City of Mobile, instead of in accordance with those of the project engineer. RLI asserts that in the project engineer's February 23, 2000, letter to the city engineer, the project engineer certified the project as completed in compliance with the project requirements. Because, says RLI, under the contract between Colquett and MLK, the project engineer's opinion is to be final and conclusive, the trial court erred in interpreting the contract to require the work on the project to be performed in accordance with the opinions of the city engineer.[2]
"`[W]e apply a de novo review to a trial court's determination of whether a contract is ambiguous and to a trial court's determination of the legal effect of an unambiguous contract term.'" Mobile Eye Ctr., P.C. v. Van Buren P'ship,826 So.2d 135, 138 (Ala. 2002) (quoting Winkleblack v. Murphy,811 So.2d 521, 525-26 (Ala. 2001)). RLI does not contend that the contract is ambiguous. In any event, "[a] court must construe a contract in its entirety, and single provisions of sentences are not to be dissociated from others having reference to the same subject matter." Englund's Flying Serv., Inc. v. Mobile AirportAuth., 536 So.2d 1371, 1373 (Ala. 1988) (citing City of Albanyv. Spragins, 208 Ala. 122, 93 So. 803 (1922); Brush Elec. Light Power Co. v. City Council of Montgomery, 114 Ala. 433,21 So. 960 (1896)).
RLI points to several provisions of the contract, quoting, however, only the language emphasized below. Section 6.11 of the contract, entitled "Permits and Regulations" provides:
 "[Colquett] shall and will, in good workmanlike manner, do and perform all work and furnish all supplies and materials, machinery, equipment, facilities and means, except as herein otherwise expressly specified, necessary to properly perform and complete all the work required by this contract, within the time herein specified in accordance with the directions of the [project] Engineer *Page 920 
as given from time to time during the progress of the work. . . . [Colquett] shall observe, comply with, and be subject to, all terms of the specifications and shall do, carry on, and complete the entire work to the satisfaction of the [project] Engineer and the Owner [MLK]."
(Emphasis added.)
Section 6.12 of the contract, entitled "Contractor's Obligations," provides:
 "[Colquett] shall and will, in good workmanlike manner, do and perform all work and furnish all supplies and materials, machinery, equipment, facilities and means, except as herein otherwise expressly specified, necessary to properly perform and complete all the work required by this Contract, within the time herein specified in accordance with the directions of the [project] Engineer as given from time to time during the progress of the work. . . . [Colquett] shall observe, comply with, and be carry on [sic], and complete the entire work to the satisfaction of the [project] Engineer and the Owner [MLK]."
(Emphasis added.)
Section 6.25 of the contract, entitled "Correction of Work," provides:
 "All work, all materials, whether incorporated in the work or not, all processes of manufacture, and all methods of construction shall be at all times and places subject to the inspection of the [project] Engineer who shall be the final judge of the quality and suitability of the work, materials, processes of the manufacturer, and methods of construction for the purposes for which they are used. Should they fail to meet his approval, they shall be forthwith reconstructed, made good, replaced and/or corrected, as the case may be by [Colquett] at his own expense. Rejected material shall immediately be removed from the site. If, in the opinion of the [project] Engineer, it is undesirable to replace any defective or damaged materials or [to] reconstruct or correct any portion of the work injured or not performed in accordance with the Contract Documents, the compensation to be paid to [Colquett] hereunder shall be reduced by such amounts considered by the judgment of the [project] Engineer as equitable."
(Emphasis added.)
Section 6.39 of the contract, entitled "Engineer's Authority" provides:
 "The [project] Engineer shall give all appropriate instructions and directions contemplated under the contract and specifications relative to the execution of the work. The [project] Engineer shall determine the amount, quality, acceptability, and fitness of the several kinds of work and materials which are to be paid for under this contract and shall decide all questions which may arise in relation to said work and the construction thereof. The [project] Engineer's estimates and decisions shall be final and conclusive, except as herein otherwise expressly provided. In case any question shall arise between the parties hereto relative to said contract or specifications, the determination or decision of the [project] Engineer shall be a condition precedent to the right of [Colquett] to receive any money or payment for work under this contract affected in any manner or any extent by such questions.
 "The [project] Engineer shall decide the meaning and intent of any portion of the specifications and of any plans or drawings where the same may be found obscure or be in dispute. Any differences or conflicts in regard to their work which may arise between [Colquett] under this Contract and other Contractors performing work for [MLK] shall be *Page 921 
adjusted and determined by the [project] Engineer."
(Emphasis added.)
RLI's argument that the approval of the project engineer is final and conclusive misses other express contract language.[3] As MLK points out in its responsive brief, Section 6.39 of the contract, quoted above, states that the project engineer's decisions shall be final and conclusive, "except as herein otherwise expressly provided." Sections 6.11 and 6.12 both state that the "Contractor shall . . . complete the entire work . . . to the satisfaction of the [project] Engineer and the Owner [MLK]." RLI fails to address the meaning of these provisions. RLI does not explain how the requirement that the work be completed to the satisfaction of "the Owner" leaves the final and conclusive approval in the hands of the project engineer; it also fails to explain how the language apparently limiting the project engineer's decisions — "except as herein otherwise expressly provided" — does not in fact limit the finality of his or her decisions. Therefore, we reject RLI's argument that the project engineer's certification and his testimony are final and conclusive evidence that the project was completed according to specifications. See Bruce v. Cole,854 So.2d at 56 ("Bruce's argument . . . disregards or ignores, contrary to the rules of construction, an express term of the contract. Therefore, this Court must reject this argument.").
Moreover, the trial court's decision does not rest on whether the contract was to be performed to the satisfaction of the project engineer, the city engineer, or the owner. The trial court simply concludes that Colquett was required under the contract to "construct the subdivision in a good and workmanlike manner, in accordance with the plans and specifications, and in compliance with the State Highway Department of Alabama Standard Specifications for Highway Construction, 1992 edition and the Mobile City Area Water Sewer Service System/Standard Specifications," and that, as a result of Colquett's failure to construct the project "in a workmanlike manner, and in accordance with the contract," there are several defects in the project. The "General Guaranty" section of the contract provides that the project engineer's final certification shall not constitute acceptance of work not done in accordance with the contract or relieve Colquett of liability for faulty workmanship.[4] In addition, Colquett was required by the contract to remedy any defects in work and to pay for any damage resulting from faulty workmanship that appeared within one year of the date of final acceptance. Thus, even if the trial court found, as RLI presumes it did, that *Page 922 
the project engineer's final certification[5] was conclusive under the contract as to the completion of the project, Colquett remained liable for any problems covered by the General Guaranty provision of the contract. RLI concedes[6]
that Colquett's obligations under the General Guaranty provision of the contract are covered by the performance bond.[7] *Page 923 
 III.
RLI argues that even if this Court determines that the trial court correctly held that RLI breached its duty under the performance bond the trial court applied the wrong measure of damages in awarding MLK the costs to correct the defects and that the judgment constitutes, therefore, economic waste. RLI asserts that the proper measure of damages in this case is diminution in value — that is, the difference between the value of the improvements as constructed and their value had the improvements been constructed in a workmanlike manner — because, RLI contends, correction of the defects would amount to economic waste.[8] We reject this argument because it was never presented to the trial court.
This Court does not consider an argument for purposes of reversing the judgment of a trial court when that argument was never presented to the trial court. State Farm Mut. Auto. Ins.Co. v. Motley, 909 So.2d 806, 821 (Ala. 2005). See McDonald v.Schwartz, 706 So.2d 1230 (Ala.Civ.App. 1997) (refusing to reverse the trial court's award of damages based on the estimated cost of repairing the residence rather than on the difference between its fair-market value as it was constructed and its fair-market value had it been properly constructed, because the issue did not appear to have been brought to the attention of the trial court). In its post-trial brief, RLI appears to have conceded that the proper measure of damages is the cost of remedying any deficient or defective work.[9] RLI did not file any postjudgment motion after the entry of the trial court's judgment awarding MLK the amount of the bond, or, alternatively, allowing RLI to have the work performed if it could do so for a lesser amount.[10] Therefore, because it was not raised in the trial court, we reject RLI's argument that the measure of damages applied was incorrect.
 IV.
RLI argues that the trial court erred in failing to reduce the damages awarded to MLK by the amount of the unpaid contract retainage and/or the amount claimed for extra work performed. The contract states that "to insure the *Page 924 
proper performance of this Contract, [MLK] shall retain ten (10%) percent of the amount of each estimate until final completion and acceptance of all work."[11] MLK argues that "final completion and acceptance" never occurred[12] and that, therefore, Colquett was not entitled to the retained amounts. RLI, citing Bruner v. Hines, 295 Ala. 111, 324 So.2d 265, 269
(1976), responds that, under the contractual doctrine of substantial performance, if Colquett's performance substantially fulfilled the main purpose of the contract, it can enforce MLK's promise to pay. RLI then asserts that because the trial court did not find the absence of substantial performance, it is entitled to an offset equal to the retained amount.
RLI's argument is premised on an assumption that Colquett substantially performed the contract. Whether a promise has been substantially performed is a question of fact to be determined from the circumstances of the case. Cobbs v. Fred BurgosConstruction Co., 477 So.2d 335, 338 (Ala. 1985). "`When a trial court makes no specific findings of fact, this Court will assume that the trial judge made those findings necessary to support the judgment.'" New Properties, L.L.C. v. Stewart, 905 So.2d 797,799 (Ala. 2004) (quoting Transamerica Commercial Fin. Corp. v.AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala. 1992)). Under the ore tenus rule, when evidence is presented ore tenus, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness and the judgment will not be reversed unless "`found to be plainly and palpably wrong.'"Transamerica, 608 So.2d at 378 (quoting FitznerPontiac-Buick-Cadillac, Inc. v. Perkins Assocs., Inc.,578 So.2d 1061, 1063 (Ala. 1991)). "`The trial court's judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.'" Transamerica, 608 So.2d at 378 (quoting Clark v.Albertville Nursing Home, Inc., 545 So.2d 9, 13 (Ala. 1989)).
Assuming RLI's legal argument is correct — that substantial performance would entitle it to the retained amounts[13] — the trial court's judgment is nonetheless correct if it found that there was not substantial performance. We cannot say, based on the record before us, that such a finding would be plainly and palpably wrong; there was credible evidence to support such a finding. The February 14, 2002, letter from the city engineer to MLK indicated that a significant amount of work — so significant that RLI asserts it amounts to reconstruction of the project — had to be performed to bring the project into compliance with the contract requirements and the standards of the City of Mobile.[14]
RLI also argues that the trial court erred in refusing to allow it an offset for the extra work performed by Colquett for which MLK did not pay. The trial court gave three reasons for determining that RLI was not entitled to an offset for the extra work allegedly performed by *Page 925 
Colquett: (1) "there is sufficient evidence to suggest that a significant amount of work called for in this change order was never performed"; (2) the extra work "was never approved, either orally or in writing by MLK"; and (3) "the amount of the change order is almost totally offset by the amount of liquidated damages owed to MLK from Colquett for its failure to complete the project in a timely manner." We note again that "`this Court will assume that the trial judge made those findings necessary to support the judgment,'" New Properties, 905 So.2d at 799, and that, under the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness and the judgment will not be reversed unless those findings are plainly and palpably wrong. Transamerica,608 So.2d at 378.
The evidence offered by MLK indicates that MLK was entitled to liquidated damages of $27,600 because Colquett failed to complete the project within the time provided in the contract. Such a finding, combined with a finding that a "substantial amount of the extra work had never been performed" would indicate that RLI's claim for extra work in the amount of $33,248 was entirely offset by liquidated damages and the amount of extra work not performed. We cannot say that the trial court's findings are plainly and palpably wrong; therefore, we will not reverse the judgment of the trial court on this asserted error.
 V.
RLI argues that MLK is estopped from claiming that Colquett should reinstall pipes and underdrain and rebuild the road and the road base, because the city engineer and the project engineer certified that those improvements had been constructed in compliance with the contract and with the standards established by the City of Mobile. In response, MLK argues that estoppel is an affirmative defense that must be specially pleaded, pursuant to Rule 8(a), Ala. R. Civ. P. RLI asserts that it did plead the affirmative defense of estoppel and points to the following statement from the section of its answer designated "Affirmative Defenses": "RLI affirmatively asserts that the work performed by Colquett was inspected, approved and accepted by the project engineer on behalf of [MLK]."[15] However, "[t]he facts constituting the defense of estoppel must be set forth with particularity." Ex parte Luverne Geriatric Ctr., Inc.,480 So.2d 562, 568 (Ala. 1985) (citing Kimbrell v. City ofBessemer, 380 So.2d 838 (Ala. 1980)).
 "`The rule is that every plea in estoppel must be certain in every particular and must allege the facts upon which the plea is predicated, and must allege every material fact which the pleader expects to prove in support of the plea. Conclusions of the pleader, not supported by a statement of facts from which the conclusions are drawn, will not suffice.'"
Kimbrell, 380 So.2d at 839 (quoting Industrial Sav. Bank v.Greenwald, 229 Ala. 529, 535, 158 So. 734, 739 (1935)). If RLI sufficiently pleaded the defense of estoppel, it did so only as to the actions of the project engineer; RLI asserted no facts in its answer as to whether the city engineer accepted the project. Therefore, we will limit any further review to RLI's assertion *Page 926 
that MLK is estopped by the actions of the project engineer.
RLI's argument, limited in that respect, is that MLK is estopped from claiming that additional work needs to be done on the project because the project engineer, allegedly aware that certain pipe was not installed as the city engineer wanted, certified that the improvements were in compliance with the contract and with the City's requirements. In support of its estoppel argument, RLI cites only Mazer v. Jackson InsuranceAgency, 340 So.2d 770, 773 (Ala. 1976), which recites the following as the basic elements of estoppel: (1) the actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct, or silence; (2) the other party relies on that communication; and (3) that other party would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.
RLI does not argue, or cite any authority for, the proposition that the project engineer's alleged knowledge should operate to estop MLK from making a claim under the contract. See Mazer,340 So.2d at 772. In addition, the "true fact" allegedly known to the project engineer — that pipes were not installed as the city engineer required — was also known to Colquett. Before the City accepted the plat, the city engineer recommended that Colquett remove the detention piping and reinstall the system in accordance with the approved plans and the manufacturer's recommendations. Instead, Colquett and the project engineer assured the city engineer that the sand and sediment in the pipes were due to surface runoff during the construction process. Therefore, the city engineer required Colquett only to clean out the sand and sediment. After the plat was approved, it became apparent that the problem was not the result of surface runoff. Because RLI does not adequately support its argument, and because the facts in the record indicate that the argument is without merit, we will not reverse the trial court's judgment on the error RLI asserts.
 VI.
Finally, RLI argues that the judgment is not supported by the evidence. However, RLI did not preserve this argument for appellate review. "[I]n a nonjury case in which the trial court makes no specific findings of fact, a party must move for a new trial or otherwise properly raise before the trial court the question relating to the sufficiency or weight of the evidence in order to preserve that question for appellate review. NewProperties, 905 So.2d at 801-02 (citing Rule 52(b), Ala. R. Civ. P.; N.L.H. v. State, 873 So.2d 258 (Ala.Crim.App. 2003);Cross v. Cross, 853 So.2d 241 (Ala.Civ.App. 2002); Gates v.Gates, 830 So.2d 746 (Ala.Civ.App. 2002); and M.B. v. State,630 So.2d 490, 491 n. 3 (Ala.Crim.App. 1993)). The record does not reflect that RLI made any such motion. Thus, this argument is not preserved for review.
 Conclusion
RLI having demonstrated no error on the part of the trial court, we affirm its judgment.
AFFIRMED.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
[1] Pursuant to Ala. Code 1975, § 35-2-52, "[it] shall be the duty of every probate judge in this state to decline to receive for record in his office any map or plat upon which any lands lying within the corporate limits . . . of any city of this state . . . are platted or mapped as streets . . . unless such map or plat shall have noted thereon the approval of the governing body or city engineer of such city." The recorded plat bears the signature of the city engineer for the City of Mobile.
[2] As noted previously, the trial court apparently derived the 18 items it lists in its judgment as needing to be corrected from the city engineer's February 14, 2002, letter to MLK, hence, RLI's assertion that the trial court's judgment is based on the opinions of the city engineer.
[3] See Bruce v. Cole, 854 So.2d 47, 56 (Ala. 2003) ("Bruce's argument that the [contract] can be interpreted to contemplate only his voluntarily terminating his own employment disregards or ignores, contrary to the rules of construction, the express term `involuntary.'").
[4] Section 6.43 of the contract, entitled "General Guaranty," states in full as follows:
 "Neither the final certificate of payment, nor any provision in the Contract Documents, nor partial or entire occupancy of the premises by the Owner [MLK] shall constitute acceptance of work not done in accordance with the Contract Documents or relieve [Colquett] of Liability in respect to any expressed warranties or responsibility for faulty materials or workmanship. [Colquett] shall remedy any defects in work and pay for any damage to the work resulting therefrom, which shall appear within a period of one year from date of final acceptance of the work unless a longer period is specified. The Owner [MLK] will give notice of observed defects with reasonable promptness."
[5] RLI's argument depends on the project engineer's "certification" that the project was completed in compliance with the contract requirements. RLI contends that the February 23, 2000, letter from the project engineer to the City of Mobile Engineering Department stating that "[i]t [was his] opinion that this job was constructed in accordance with the approved drawings and the City of Mobile standards" constitutes the project engineer's certification. However, § 6.55 of the contract describes final certification as follows:
 "Final payment shall be due thirty (30) days after issuance of final certificate, provided the work be then fully completed and the contract fully performed.
 "Within ten (10) days after receipt of written notice that the work is ready for final inspection and acceptance, [Colquett], [project] Engineer, and the Owner [MLK] shall make such inspection, and when the work is found acceptable under the terms of this contract, the [project] Engineer shall issue the final certificate in writing stating that the work provided for in the contract has been completed and is accepted and the terms and conditions thereof.
 "Before issuance of the final certificate, [Colquett] shall submit evidence satisfactory to the Owner [MLK] that all payroll, materials, bills, and other indebtedness connected with the work have been paid and that he has advertised and met all State, County, and City Codes, and other requirements. . . ."
We are not convinced that the February 23, 2000, letter from the project engineer to the City of Mobile constitutes a "final certificate." Section 6.55 contemplates that the project engineer will issue a final certificate to the contractor. The project engineer sent the February 23, 2000, letter to the City of Mobile. The City of Mobile responded to the letter by taking exception to the project engineer's statement that the project was in compliance with the City's requirement and indicating certain items that needed to be remedied. After it appeared to the City that those remedial measures had been taken, the City accepted the project. However, there is no indication that thereafter the procedures leading up to the issuance of a final certificate were completed, or that the project engineer thereafter issued a written "final certificate."
[6] RLI acknowledges that the contract contains a warranty provision and that its performance bond covers Colquett's warranty obligations. It states in its post-trial brief to the trial court: "The performance bond guarantees the full and complete performance of all its contract provisions by its principal Colquett. Accordingly, assuming there to be outstanding warranty obligations, those would be covered by the performance bond." RLI admits in its briefs that certain work is due to be performed pursuant to the warranty. RLI does not refer to § 6.43 (or any other section) of the contract as constituting the warranty. However, MLK refers in its brief to § 6.43, entitled "General Guaranty," as the warranty provision of the contract; RLI does not dispute that reference.
[7] RLI argues elsewhere in its brief that MLK failed to give timely notice. However, that argument is not adequately supported. Pursuant to § 6.43 of the contract quoted above, the guaranty period begins "from the date of final acceptance of the work unless a longer period is specified." RLI suggests that this guaranty period should begin in February or April 2000; RLI states that the work was "certified to be in compliance with the contract and City requirements" in February 2000 and that the plat was recorded on April 6, 2000. RLI provides no reference to the record to support its statement that the work was certified as compliant in February 2000. It apparently is referring to the February 23, 2000, letter from the project engineer to the city engineer which, as noted in footnote 5 above, we are not convinced is a final certification. In addition, RLI does not provide any facts or argument regarding when the defects appeared and thus does not even attempt to show that the defects appeared after the guaranty period had expired. Notice is required with reasonable promptness after the defects are observed. RLI states that "the City had testing done, in January of 2001 . . . and reports and/or discussions of the testing were communicated to RLI." Thus, we might infer that defects were observed within one year of February 2000. In any event, we will not endeavor further to determine from the record whether notice of defects was timely. "[T]his Court is not under a duty to search the record in order to ascertain whether it contains evidence that will sustain a contention made by either party to an appeal." Totten v.Lighting Supply, Inc., 507 So.2d 502, 503 (Ala. 1987).
[8] MLK responds that the diminution-in-value measure of damages is inapplicable in this case because, it argues, public facilities, such as streets, sewer systems, and utility pipes, have no market value. MLK cites Tuscaloosa County v. Jim ThomasForestry Consultants, Inc., 613 So.2d 322, 324 (Ala. 1992) ("[A] consideration of damages for the destruction of an inherently unmarketable structure in the context of market value represents a contradiction in terms. Damages for the destruction of the Whittson bridge cannot, therefore, be computed on the basis of market value.". We need not decide whether this argument is meritorious.
[9] RLI argued in its post-trial brief that the only contractual breach possible was a breach of warranty, that the project engineer identified six specific items as warranty items, and that Colquett testified that the amounts reasonably necessary to correct these warranty items was approximately $11,000, or a maximum of $15,000.
[10] RLI did move the trial court, post-trial, to reconsider a prior ruling and to conform the pleadings to the evidence. However, RLI did not argue any damages issue in that post-trial motion.
[11] RLI does not attempt to explain or define the term "contract retainage" in its brief.
[12] As we discuss in footnote 5, whether final completion and acceptance ever occurred is uncertain.
[13] Neither Bruner nor the other authority RLI cites addresses contractual provisions relating to retainage.
[14] Although there was testimony indicating that a lesser amount of work could bring the project into compliance, it was for the trial court to determine the weight and credibility of that testimony. Wheeler v. Marvin's, Inc., 593 So.2d 61, 63
(Ala. 1991).
[15] MLK asserts that it also discussed estoppel in its trial briefs and that testimony elicited during the trial related to estoppel. MLK moved the trial court, post-trial, to amend the pleadings to conform to the evidence, pursuant to Rule 15(b), Ala. R. Civ. P. The trial court denied that motion. RLI does not address that ruling on appeal. *Page 927