[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1048 
Robert L. Tanksley, the plaintiff below, appeals from summary judgments entered in favor of the defendants, Rockwell Automation, Inc. ("Rockwell"), Danieli Corporation ("Danieli"), ProSoft Automation, Inc. ("ProSoft Automation"), and PROSOFT, Inc. (collectively "the defendants"), in this action seeking damages for injuries sustained in an industrial accident. We affirm.
 Facts and Procedural History
Tanksley worked as a welder at a steel mill operated by United States Steel Corporation ("U.S. Steel") and located in Jefferson County. The facility used a "pickle line" system to treat steel. In a pickle line, a continuous strip of flat steel passes through various equipment and is treated with an acid rinse. The steel strip is threaded through several "pinch" rollers that push the strip through the machinery.
The "No. 4" pickle line at the U.S. Steel facility was designed by Wean Incorporated ("Wean") and had been installed at the U.S. Steel facility in the 1960s. Wean ultimately filed a petition in bankruptcy, and Danieli purchased Wean. At some point in the mid-1990s, PROSOFT, Inc., contracted to upgrade the drive and control systems on the No. 4 pickle line. A control panel manufactured by Rockwell and carrying the Allen-Bradley Company brand was installed on the No. 4 pickle line during the upgrade.
On August 3, 2002, Tanksley and several co-employees were working to repair the No. 4 pickle line. Apparently, the steel strip being processed on the line broke and had to be rethreaded through the equipment and welded back together. To gain access to the pickle line to rethread the steel strip, an overhead crane was used to remove certain equipment that rested above the line, including a hot-air dryer cover. After the steel strip was repaired and in place, Tanksley and his co-employees began to replace the hot-air dryer cover. In doing so, Tanksley stood directly on the steel strip to guide the dryer cover into place as the crane lowered it. As Tanksley stood there, another employee at a control station activated the line in an attempt to "jog" or move the strip. When the strip moved, Tanksley's legs were pulled in between two rollers; the resulting injuries required the amputation of his right leg below the knee and the toes of his left foot.
On February 18, 2003, Tanksley sued the defendants, seeking damages for his injuries: Tanksley amended his complaint three times, ultimately alleging that the defendants were liable under the Alabama *Page 1049 
Extended Manufacturer's Liability Doctrine ("AEMLD") for alleged defects in the No. 4 pickle line. Tanksley also sued various co-employees, but those claims were later settled and are not at issue in this appeal.
On May 20, 2005, Rockwell filed a motion for a summary judgment. Tanksley filed materials in opposition to the motion on July 11, 2005. The remaining defendants filed their own individual motions several days later. On August 31, 2005, the trial court entered summary judgments for both Rockwell and Danieli. On September 16, 2005, Tanksley filed an affidavit by his expert witness in opposition to the "defendants[']" motions for summary judgment. Subsequently, the trial court entered a summary judgment in favor of both PROSOFT, Inc., and ProSoft Automation. Tanksley appeals.
 Standard of Review
We review a summary judgment by the following standard:
 "`"In reviewing the disposition of a motion for summary judgment, we utilize the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact" and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989).'
 "Ex parte General Motors Corp., 769 So.2d 903, 906 (Ala. 1999). When the basis of a summary-judgment motion is a failure of the nonmovant's evidence, the movant's burden, however, is limited to informing the court of the basis of its motion — that is, the moving party must indicate where the nonmoving party's case suffers an evidentiary failure. See General Motors, 769 So.2d at 909 (adopting Justice Houston's special concurrence in Berner v. Caldwell, 543 So.2d 686, 691 (Ala. 1989), in which he discussed the burden shift attendant to summary-judgment motions); and Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (stating that `a party seeking summary judgment always bears the initial responsibility of informing the [trial] court of the basis of its motion'). The moving party must support its motion with sufficient evidence only if that party has the burden of proof at trial. General Motors, 769 So.2d at 909."
Rector v. Better Houses, Inc., 820 So.2d 75, 79-80
(Ala. 2001). Additionally, we "accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts in favor of the nonmoving party."Bruce v. Cole, 854 So.2d 47, 54 (Ala. 2003).
 Discussion
The elements of an AEMLD claim are as follows:
"`"To establish liability, a plaintiff must show:
 "`"(1) he suffered injury or damage to himself or his property by one who sells a product in a defective condition unreasonably dangerous *Page 1050 
to the plaintiff as the ultimate user or consumer, if
 "`"(a) the seller is engaged in the business of selling such a product, and
 "`"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it [was] sold."'
 "Yamaha Motor Co. v. Thornton, 579 So.2d 619, 621 (Ala. 1991) (quoting Casrell v. Altec Indus., Inc., 335 So.2d 128, 132-53 (Ala. 1976))."
Kirk v. Garrett Ford Tractor, Inc., 650 So.2d 865, 866
(Ala. 1994).
On appeal, Tanksley alleges generally that the defendants failed to meet their initial burden on summary judgment to establish that there was no genuine issue of material fact. Therefore, he argues, the burden did not shift to him to create such an issue. Tanksley further contends that, even if the defendants did shift the burden, he introduced substantial evidence of several defects in the machinery on the No. 4 pickle line: (1) there was no "delayed start" mechanism or audible warning system that would activate before the line began to move; (2) the pickle line lacked guards to protect workers from accidental contact with pinch points; and (3) there were no platforms to provide a safe area for workers to stand while they were working on the line. As discussed below, we affirm the summary judgments as to each of the defendants.
A The Claims Against Rockwell
Tanksley alleged in count four of his complaint that he was entitled to recover under the AEMLD against "Allen-Bradley Company," because it provided no pinch-point guards on the pickle line and no means "of locking out" the pickle line during periods of maintenance, and because it failed to warn Tanksley "of the danger of performing maintenance on the energized Pickle Line under such conditions" Count five of the complaint alleges that Rockwell is the "successor in liability" to Allen-Bradley Company and is liable under the AEMLD for failing to provide a "means of locking out the Pickle Line during periods of maintenance and failing to warn [Tanksley] of the danger of performing maintenance on the energized Pickle Line under such conditions" Because Tanksley alleges that Rockwell is the successor in liability to "Allen-Bradley Company," we construe both counts four and five as alleging causes of action against Rockwell, even though count five does not contain the allegation that Rockwell is liable for failure to provide pinch-point guards.
The record reveals that Rockwell either manufactured or designed an Allen-Bradley brand control panel that was used on the pickle line and that this is the only Rockwell product involved in this case. Rockwell contended in its summary-judgment motion that the control panel was equipped with a button that would have de-energized the pickle line, thus preventing the movement of the line, and that there were other lockout devices available to turn off the pickle line. Rockwell further argued that Tanksley could produce no testimony identifying any specific defect in the panel or explaining what was wrong with any product designed or manufactured by Rockwell and that Tanksley's own expert testified that he found no defect in the panel.
In support of its motion for a summary judgment, Rockwell submitted deposition testimony of U.S. Steel employees who described the operation of the control panel, which was located approximately 15 to 20 feet from the area where the accident occurred. The control panel was also equipped with a "pickle section stop" button *Page 1051 
that, when pressed, would stop the line if it was moving, but would not prevent the line from being restarted. The control panel was also equipped with a button labeled "pickle section on/off."[1] The button, when activated, would "de-energize" the pickle line, and a light on the button would illuminate to indicate that the line was de-energized. The button would have to be moved again to re-energize the line; when the line was re-energized the light would turn off. The line could not be restarted until the "pickle section on/off button had been deactivated to re-energize the line. Once the line was re-energized, it would be restarted by controls in a control room; simply re-energizing the line alone would not cause the pickle line to move. Rockwell asserted that the "pickle section on/off button was an adequate means to render the pickle line safe while maintenance was being performed on the line.
Additionally, Rockwell presented testimony indicating that there were three other "lockout" switches that would have prevented the pickle line from moving had they been activated. Tanksley acknowledges that "[a]t the time of the plaintiffs accident, there were several lockout devices available[:] at the bliss mill, the trimmer, and the motor control room, to lock out the movement of the pickle line." Tanksley's brief at 18.[2]
Rockwell also argued that Tanksley's own experts could not testify that the control panel was defective. Rockwell submitted a portion of the deposition testimony of Dr. B.J. Stephens, Tanksley's expert witness. Dr. Stephens stated that he offered no opinion as to whether the Allen-Bradley control panel was defective, and he testified that, to the best of his knowledge, on the day of the accident the control panel operated as designed. Dr. Stephens affirmed that he had "no criticisms" of any Allen-Bradley control panels. He further stated that the "pickle section on/off button was an adequate means to de-energize the line, although it would not qualify as a "lockout."[3] He testified that if the "pickle section on/off button had been activated and had de-energized the line, the accident would not have happened.
In an AEMLD action, "the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition." Jordan v. General Motors Corp.,581 So.2d 835, 836-37 (Ala. 1991). "Without evidence to support the conclusion that the product was defective and/or unreasonably dangerous when it left the hands of the seller, the burden is not sustained." Jordan, 581 So.2d at 837. "Proof of an accident and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown." Townsend v. General MotorsCorp., 642 So.2d 411, 415 (Ala. 1994).
Rockwell argued that Tanksley could produce no evidence indicating that the control panel was defective. "When the *Page 1052 
basis of a summary-judgment motion is a failure of the nonmovant's evidence, the movant's burden . . . is limited to informing the court of the basis of its motion" that is, the moving party must indicate where the nonmoving party's case suffers an evidentiary failure." Rector,820 So.2d at 80. We hold that Rockwell presented sufficient evidence to inform the trial court of an evidentiary failure in Tanksley's case, namely, that Tanksley's own expert witness could not identify a defect in the Allen-Bradley control panel. Additionally, Rockwell presented substantial evidence indicating that there were numerous means to both lockout or de-energize the pickle line while the line was undergoing maintenance, but that none of those means were used on the day of Tanksley's accident. Therefore, the burden shifted to Tanksley to present substantial evidence creating a genuine issue of material fact.[4]
Tanksley filed a memorandum in opposition to Rockwell's summary-judgment motion on July 11, 2005. The memorandum asserted that the No. 4 pickle line was defective because it failed to incorporate a "delayed start" mechanism. The memorandum did not address an alleged failure by Rockwell to install lockouts or pinch-point guards. In support of the opposition, Tanksley attached a document prepared by Dr. Stephens titled "preliminary report." The preliminary report asserted that the pickle line, in general, was defective and unreasonably hazardous because the hot-air dryer had no warnings to instruct workers about "pinch points" between the moving steel strip and the dryer rollers, because there were no guards to protect workers from accidental contact with pinch points, and because there were no platforms to provide workers with safe locations in which to work on the pickle line. The preliminary report further stated:
 "It is common design practice to incorporate devices that would prevent equipment from being energized while maintenance is being performed. It is also common practice to incorporate a delayed start for equipment capable of being remotely started or for equipment that is controlled by an operator who does not have a full and clear view of the entire machine. During this delay, a klaxon, bell, or other warning device is sounded to warn workers of the impending start or movement of the equipment. No such warning device was incorporated into the # 4 pickle line."
The preliminary report does not discuss whether the Allen-Bradley control panel was defective.
Tanksley also included in his opposition to Rockwell's summary-judgment motion one page of a document titled "Safety Standard for Conveyors and Related Equipment" published by the American Society of Mechanical Engineers (hereinafter "the ANSI standards"). Additionally, Tanksley included several pages of the transcript of Dr. Stephens's deposition in which he was asked about his mention of "the common practice to incorporate a delayed start" mechanism for remotely operated equipment. Dr. Stephens testified that he did not know if such a delayed-start mechanism was in use with the pickle line. Tanksley states in his memorandum in opposition to Rockwell's summary-judgment *Page 1053 
motion that the defendants "chose" not to "explore" his claim on this issue. Finally, Tanksley included with the opposition an affidavit of Stephan Moore, a former U.S. Steel employee, who stated that there was no delayed-start mechanism installed on the pickle line. Instead, employees would rely on an announcement over a public-address system indicating that the pickle line was about to start moving.[5]
On July 14, 2005, Rockwell filed a motion to strike Tanksley's opposition as un-timely filed and to strike the preliminary report because, Rockwell argued, it was unsworn, unauthenticated, and inadmissible hearsay. On appeal, Rockwell continues to argue that the preliminary report was due to be stricken and that it cannot be considered in opposition to its summary-judgment motion. On appeal, Tanksley does notaddress whether the preliminary report was due to bestricken. Instead, he notes only that because the trial court did not rule on Rockwell's motion to strike Tanksley's opposition, this Court assumes that the trial court considered the materials he filed in opposition. See Hannah v. Gregg,Bland Berry, Inc., 840 So.2d 839, 850 (Ala. 2002).
Documents submitted in support of or in opposition to a summary-judgment motion are generally required to be certified or otherwise authenticated; if they are not, they constitute inadmissible hearsay and are not considered on summary judgment. Power Equip. Co. v. First Alabama Bank,585 So.2d 1291, 1299 (Ala. 1991); Carter v. Cantrell MackCo., 662 So.2d 891, 893 (Ala. 1995) (plurality opinion) ("Documents submitted as exhibits to affidavits or otherwise must be admissible in evidence either as sworn or certified copies."); Chatham v. CSX Transp., Inc.,613 So.2d 341, 343-44 (Ala. 1993) ("Evidence submitted by a nonmovant in opposition to a motion for summary judgment must be in a form admissible in evidence; . . . documents must be admissible in evidence as either sworn or certified copies."). See also Rule 56(e), Ala. R. Civ. P. However, the party opposing the documents must generally object to the admissibility of nonconforming documents and move to strike them. ElizabethHomes, L.L.C. v. Cato, 968 So.2d 1, 4-5 (Ala. 2007).
Rockwell moved the trial court to strike the preliminary report, and it argues on appeal that the report cannot be considered. Because the preliminary report is not sworn, not certified, and does not comply with Rule 56(e), Ala. R. Civ. P., we will not consider it in our de novo review.
Tanksley argues on appeal that there are disputed questions of fact regarding the buttons on the Allen-Bradley control *Page 1054 
panel.[6] Tanksley contends that there is a "dispute in the evidence" regarding whether the "control button" would de-energize the pickle line. He notes that the defendants asserted that the "control button" would de-energize the line and that the line could not be started until the button was moved a second time and the pickle line was then started from the control room. Tanksley argues that his witness, Moore, testified that "[h]itting the stop button would not have stopped the line from starting up again." (Emphasis added.) Tanksley then implies that there is a dispute as to how the "control button"` works. We disagree.
Tanksley is conflating testimony regarding two different buttons on the control panel, the "pickle section stop" button and the "pickle section on/off button, into a single, nonexistent "control button." It is apparent from the record that Moore was referring to the "pickle section stop" button when he said that the "stop button" would not prevent the line from restarting. Rockwell does not contend that the "pickle section stop" button prevents the line from moving or would have prevented the accident if it had been used; instead,there is uncontroverted evidence that the "picklesection on/off" button would illuminate when activated and de-energizethe line. The line could not be restarted until the "picklesection on/off" button was deactivated, and then the line couldbe restarted only in the control room. Even Tanksley's own expert, Dr. Stephens, stated that the "pickle section on/off button was an adequate means to de-energize the line, and that if the "pickle section on/off button had been activated and the line deenergized, the accident would not have happened.
Tanksley also alleges on appeal that there exists substantial evidence of several defects in the pickle line; specifically, there was no "delayed start" mechanism or audible warning system before the line began to move and there were no plat-forms to provide a safe area for employees to perform maintenance on the line. First, the claims against Rockwell, as set out in the complaint, allege only that Rockwell was liable for failure to provide a means of locking the line. There is no allegation in the complaint that Rockwell was liable for failing to use delayed-start technology or failing to provide safe work platforms. In any event, without Dr. Stephens's preliminary report, there was no evidence at the time the trial court granted Rockwell's summary-judgment motion regarding the need for delayed-start technology. Additionally, the remaining evidence submitted in opposition to the summary-judgment motion — the ANSI standards, portions of the transcript of Dr. Stephens's deposition, and the affidavit of Stephan Moore — do not create a genuine issue of material fact as to the claims alleged in the complaint and addressed in Rockwell's motion. None of the ANSI standards, the transcript pages of Dr. Stephens's deposition, or Moore's affidavit provides substantial evidence indicating that any Rockwell product was defective as alleged in the complaint. Moreover, although Tanksley attempts to argue that testimony found in an affidavit by Dr. Stephens filed in the trial court on September 16, 2005, creates an issue of fact, that affidavit was filedafter the trial court granted Rockwell's summary-judgment motion. Therefore, Tanksley failed to present substantial evidence as to any genuine issue of material *Page 1055 
fact with respect to his claims against Rockwell, and the trial court's summary judgment in favor of Rockwell is due to be affirmed.
B. The Claims Against Danieli
In its motion for a summary judgment, Danieli contended, among other things, that the No. 4 pickle line had been substantially modified since it was designed and installed in the 1960s, and that these alterations actually caused Tanksley's injuries, thus relieving Danieli from any liability under the AEMLD.[7]
 "An essential element of an AEMLD claim is proof that the product reached the consumer without substantial change in the condition in which it was sold. Sears, Roebuck Co. v. Harris, 630 So.2d 1018, 1027 (Ala. 1993); see also Clarke Indus., Inc. v. Home Indem. Co., 591 So.2d 458, 462
(Ala. 1991). However, the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer or seller of liability. Sears, Roebuck Co., supra; see also Johnson v. Niagara Machine Tool Works, 555 So.2d 88, 91 (Ala. 1989). A manufacturer or seller remains liable if the alteration or modification did not in fact cause the injury, or if the alteration or modification was reasonably foreseeable to the manufacturer or seller. Sears, Roebuck Co., supra; see also Industrial Chem. Fiberglass Corp. v. Hartford Accident Indem. Co., 475 So.2d 472, 476 (Ala. 1985), and Clarke Indus., 591 So.2d at 462."
Hannah, 840 So.2d at 855.
In Williamson v. Tyson Foods, Inc., 626 So.2d 1261
(Ala. 1993), a child was injured when he put his finger into a hole found on an automatic chicken feeder manufactured by C.T.B., Inc. The child's mother sued C.T.B. under the AEMLD; alleging that the chicken feeder was not reasonably safe for its intended use and that C.T.B. failed to warn of the unreasonably dangerous condition of the feeder.
The evidence in the record demonstrated that the hole into which the child put his finger had been drilled into the chicken feeder by its owner, Smith, to increase the feed output and that the feeder, as designed by C.T.B., did not have that hole. Therefore, this Court held:
 "We note that `the mere fact that a product has been modified by the buyer subsequent to the sale does not always relieve a manufacturer of liability.' Johnson v. Niagara Machine Tool Works, 555 So.2d 88, 91 (Ala. 1989). However, the plaintiff must show that `the injury was not caused by the change.' Id. (quoting Industrial Chemical Fiberglass Corp. v. Hartford Ace. Indem. Co., 475 So.2d 472 (Ala. 1985)). The record in this case clearly shows that [the child] was injured when he stuck his finger into a hole drilled by Smith. [The child's mother] failed to produce substantial evidence in order to defeat C.T.B.'s properly supported motion for summary judgment. Therefore, we affirm the summary judgment as to C.T.B."
626 So.2d at 1264.
Danieli presented substantial evidence that the No. 4 pickle line had been substantially altered since it was originally designed and installed by Wean and that those alterations caused Tanksley's injury. *Page 1056 
Specifically, Danieli produced the affidavit of Richard K. Lordo, who stated that he had 40 years' experience as an engineer and designer in steel-mill machinery design. Lordo testified that he was familiar with the design of the No. 4 pickle line, that it had been materially altered from its original design, and that those alterations created circumstances unforeseen by the original design:
 "The line at issue has been materially altered. Specifically, the hot air drier as originally sold and installed had been so materially altered that it no longer met the original design and function expectations. A lid or cap has been fabricated to go on top of the hot air drier in a manner that materially alters the design of the hot air drier, compromises its efficiency and efficacy and materially changes the utilization anticipated by the manufacturer. As originally designed, there was no hot air drier lid for the # 4 pickle line. Therefore, there could never be any circumstance in which a worker would be expected to stand on this line in front of the in-running rollers or nips.
 ". . . Further, there was no reason for the designer or manufacturer to expect that any worker would place himself on the strip of steel at or upstream of the hot air drier. . . .
 "There is no known effective means to guard the rollers where the plaintiff was injured but they are effectively guarded by other means of protection including but not limited to signs directing workers never to stand on the strip of steel, electrical devices able completely to de-energize the line so that the accident couldn't occur, and by the positioning where the strip of steel and the in-rolling rollers or nips are away from any anticipated area of use by any worker. Otherwise, due to the need for the steel to move in an unimpeded fashion from the hot air drier to the rollers, there is no known effective, efficient way to safely install any guard that would not compromise the effect of the machinery and the roll of steel.
 ". . . .
 "This equipment when sold as original equipment was not defective, and there was no known reason to have had any additional guarding in place at the place of the plaintiffs accident. Also, no known feasible alternative guarding is available to guard the in-rolling rollers where the plaintiff was injured. There was no foreseeable reason that a worker would ever be in this position as there was nothing about the hot air drier that required any lid, cap or shield as originally designed."
(Emphasis added.)
The record reveals that Tanksley submitted no response directed to Danieli's motion for a summary judgment. We find nothing in the materials submitted to the trial court before it granted Danieli's summary-judgment motion that provided substantial evidence indicating that Tanksley's injury was not caused by the alterations to the No. 4 pickle line made after it was installed at the U.S. Steel facility. Williamson,626 So.2d at 1264. Additionally, Tanksley does not address this issue on appeal. Therefore, Tanksley has failed to show the existence of a genuine issue of material fact, and the trial court did not err in entering the summary judgment for Danieli.
C. The Claims Against PROSOFT, Inc., and ProSoft Automation
Tanksley alleged in count one of his final amended complaint that he was entitled to recover "pursuant to the Alabama Manufacturer's Extended Liability Doctrine" against PROSOFT, Inc., because *Page 1057 
it failed to provide pinch-point guards or a means of locking out the No. 4 pickle line while maintenance was being performed on the line and failed to warn Tanksley of the danger of performing maintenance on the pickle line while it was energized. Count two of the complaint alleged that Tanksley was entitled to recover against ProSoft Automation under the AEMLD "as the successor in liability of [PROSOFT], Inc." Both PROSOFT, Inc., and ProSoft Automation (collectively "the ProSoft defendants") filed motions for a summary judgment.[8]
On appeal, Tanksley argues that the ProSoft defendants failed to present substantial evidence indicating that there was no genuine issue of material fact and thus did not shift the burden to him to produce substantial evidence creating such an issue. We disagree.
The ProSoft defendants presented an affidavit of Stephen Young, the former part owner of PROSOFT, Inc., and founder, part owner, and former president of ProSoft Automation.[9] Young stated that PROSOFT, Inc., had contracted with U.S. Steel to perform upgrade work on the drive and control systems of the pickle line in the 1990s; ProSoft Automation was later contracted to perform certain mechanical work on the line. Neither company, Young asserted, played a role in installing the rolls that created the pinch point or in installing the air dryer where Tanksley was injured, neither company was involved in designing or installing any guards, and neither company was involved in analyzing whether any guards were necessary. The ProSoft defendants also presented portions of Dr. Stephens's deposition in which he agreed that there were "practical problems" in placing guards in the front of steel-coil rollers because the guards would deny access when rethreading the steel coils and would thus have to be removed for the rethreading process.
We hold that the ProSoft defendants presented substantial evidence indicating that they were not the manufacturer or seller of the portion of the No. 4 pickle line that lacked pinch-point guards. Additionally, Dr. Stephens's testimony presents substantial evidence indicating that the addition of pinch-point guards was not practical and would not have prevented Tanksley's injuries because the guards would have had to have been removed to perform the work Tanksley was performing. See Yarbrough v. Sears, Roebuck Co.,628 So.2d 478, 482 (Ala. 1993) (affirming summary judgment in favor of a defendant manufacturer in an AEMLD case because *Page 1058 
the "there was no evidence to show that the utility of an alternative design outweighed the utility of the design actually used").[10] Therefore, the burden shifted to Tanksley to produce substantial evidence of the existence of a genuine issue of material fact on his claim that the ProSoft defendants were liable for failing to provide pinch-point guards.
The ProSoft defendants also produced substantial evidence in the form of depositions and affidavits from U.S. Steel employees indicating that the No. 4 pickle line was equipped with several devices capable of preventing the line from moving — including lockouts at the "bliss mill" and the trimmer and the "pickle section on/off button on the Allen-Bradley control panel. The employees further testified that these devices would have prevented the movement of the pickle line had they been used. This evidence, like the evidence produced by Rockwell discussed above, is substantial evidence indicating that the pickle line was not defective for failure to provide a means of locking out the pickle line during periods of maintenance on the line.
It appears from the record that Tanksley filed no memorandum in response to the ProSoft defendants' motions for a summary judgment. Instead, on September 16, 2005, Tanksley filed an affidavit by Dr. Stephens. In this affidavit, Dr. Stephens testified that it was feasible to construct the pickle line with delayed-start technology that would warn nearby workers that the line was about to move.[11]
Dr. Stephens's affidavit is not substantial evidence indicating that the ProSoft defendants were liable for failing to provide pinch-point guards, and it does not provide substantial evidence indicating that the pickle line was defective for failing to provide a means of locking out the pickle line while maintenance was being performed on the line. In short, Dr. Stephens's affidavit does not create a genuine issue of factas to any of the claims found in Tanksley's complaint andaddressed in the ProSoft defendants' motions for a summaryjudgment. Instead, it addresses only the failure to use delayed-start technology, a new theory of liability and analleged defect not asserted in complaint and raised for thefirst time in response to the motions for a summaryjudgment. Therefore, the trial court did not err in entering the summary judgments for the ProSoft defendants.
Finally, Tanksley, citing Plant v. R.L. Reid, Inc.,365 So.2d 305 (Ala. 1978), and Hannah, supra, argues that the all the defendants owed an independent duty to Tanksley to recommend to U.S. Steel the installation of delayed-start technology, pinch-point guards, and safe work platforms. However, it appears that this issue is raised for the first time on appeal; therefore, it is not preserved for review.[12] *Page 1059 
See RLI Ins. Co. v. MLK Ave. Redev. Corp.,925 So.2d 914, 918 (Ala. 2005) (holding that an argument by the appellant was waived because it was raised for the first time on appeal). In any event, unlike the plaintiffs inPlant and Hannah, Tanksley presented no evidence indicating that such a duty arose in this case. SeePlant, 365 So.2d at 306-07 (noting that the plaintiff presented expert testimony that in failing to suggest safety guards on a conveyor system, the defendants failed meet the standards of conduct imposed on licensed engineers);Hannah, 840 So.2d at 857-58 (holding that the plaintiff created a genuine issue of material fact by presenting expert testimony that a defendant should have noticed the lack of a safety feature and suggested that it be corrected).
Conclusion
The summary judgments are affirmed.
AFFIRMED.
COBB, C.J., and SEE, WOODALL, SMITH, and PARKER, JJ., concur.
[1] Although the "pickle section on/off" feature is referred to in the record as a "button," it appears actually to be a knob that is pushed or pulled into position.
[2] Tanksley appears to state in his brief that, even with the lockout devices that existed in this case, the accident would not have been prevented: "There are three other places at which the line can be locked out than the panel near where the plaintiff was injured . . . [A]ll the buttons failed to prevent this accident. . . ." Tanksley's brief at 31-32.
[3] The parties do not provide a definition of what would constitute a "lockout." Apparently, a "lockout" is a switch that deactivates the line and accepts a portable lock so that individual workers can ensure that no one else uses the switch. Tanksley testified in a deposition that he was given such a lock, but that it was lost in a house fire.
[4] Tanksley's brief on appeal does not present a specific argument as to whether Rockwell failed to shift the burden of proof on his failure-to-warn claim. Thus, we do not consider that issue on appeal. Additionally, the arguments in the record and on appeal revolve around whether Rockwell was liable for a defect in the control panel or for otherwise failing to provide a lockout device; the parties make no issue of whether Rockwell is liable for failing to install pinch-point guards.
[5] Tanksley also filed on July 11, 2005, a motion under Rule 56(f), Ala. R. Civ. P., to continue the hearing on Rockwell's summary-judgment motion so that additional discovery could take place. The motion asserted that Tanksley needed documents from U.S. Steel, ProSoft Automation, and PROSOFT, Inc., and that Tanksley needed to depose Stephen Young, a former employee of PROSOFT, Inc. The Rule 56(f) motion was supported by an affidavit of one of Tanksley's counsel.
Tanksley does not argue in his initial brief that he had insufficient time in which to conduct discovery; however, in his reply brief, Tanksley states that he filed two
Rule 56(f) motions and that the trial court "ignored" them. It is unclear from the record how the trial court ruled on the July 11 motion; however, Tanksley states in his second motion, which is a motion to continue the hearing on the motion for a summary judgment and is not supported by an affidavit, that the trial court granted the July 11 motion on July 15, 2005.
[6] First, it is unclear whether this issue was raised in the trial court, because Tanksley's opposition to Rockwell's motion for a summary judgment — the only legal argument presented to the trial court by Tanksley that is found in the record — does not contend that there is a conflict in the evidence regarding this issue.
[7] Danieli also contended that it was not liable because the pickle-line equipment was designed and manufactured by Wean before Danieli purchased Wean, that Tanksley could not prove that a safer alternative design was feasible in this case, and that Tanksley had been contributorily negligent. Because of our disposition of Tanksley's claims, we need not discuss these issues.
[8] Tanksley does not argue that the trial court erred in entering a summary judgment against the ProSoft defendants on the failure-to-warn claim. Therefore, there is no need to address that issue on appeal. However, we note that the ProSoft defendants presented substantial evidence indicating: (1) that they had no duty to Tanksley because U.S. Steel was a sophisticated user of pickle lines, (2) that Tanksley and U.S. Steel already knew of the danger an energized line presented when employees were working on it, and (3) that even if the ProSoft defendants had warned Tanksley and U.S. Steel, the warning would not have been heeded because numerous safety procedures were ignored while the No. 4 pickle line was being repaired.
Additionally, Tanksley alleged in count three of the final amended complaint that he was entitled to recover against ProSoft Automation because it "negligently, recklessly or intentionally maintained, modified or repaired" a welding machine operated by Tanksley. Tanksley does not allege on appeal that the trial court erred in entering the summary judgment in favor of ProSoft Automation on this count; therefore, we likewise do not address that count on appeal.
[9] ProSoft Automation was incorporated in October 1997. Its relationship to PROSOFT, Inc., an existing corporation when ProSoft Automation was incorporated, is unclear.
[10] We also note that Lordo's affidavit, although filed by Danieli, was also before the trial court when it was considering the summary-judgment motions filed by the ProSoft defendants, and he stated in that affidavit that there was no effective means to guard the rollers: "There is no known effective means to guard the rollers where the plaintiff was injured."
[11] The ProSoft defendants both moved to strike the affidavit, and it does not appear that the trial court ruled on the motion to strike. However, given our disposition of this issue, we see no need to address whether the motion should have been granted.
[12] In his reply brief, Tanksley also appears to claim that he alleged a negligence claim against Rockwell that was separate from his AEMLD claim. Specifically, Tanksley cites the "facts" portion of the first amended complaint, which states generally that "[t]he Defendants negligently, wantonly, or willfully" failed to equip the No. 4 pickle line with warnings and readily available devices that would have prevented the line from operating "during periods of maintenance," that they tortiously continued to allow the pickle line to operate in this manner, and that they failed to inspect the pickle line for defects. A substantially similar statement appears in the "facts" portion of the final amended complaint. Tanksley fails to explain whether this statement should be considered a cause of action different than the causes of action asserted in the individual counts found in the "causes of action" section of his final amended complaint. However, Tanksley appears to merge this purported negligence cause of action with his allegation that the defendants owed Tanksley an independent duty underPlant and Hannah to suggest safety features, a claim that was not argued in the trial court and that was not supported by expert testimony.